IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-41084
_____


WILLIAM W. GOODSON,

                              Plaintiff-Appellant-Cross-
                              Appellee,

                    v.

CITY OF CORPUS CHRISTI; CORPUS CHRISTI POLICE
DEPARTMENT; POLICE CHIEF; OFFICER B.J. GAINES; and OFFICER  F.V.
PEREZ,

                              Defendants-Appellees-Cross-
                              Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
January 26, 2000

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellant William W. Goodson ("Goodson") appeals from the district court's grant of summary judgment in favor of appellees City of Corpus Christi ("The City"), City of Corpus Christi Police Department, the Police Chief, and Officers B.J. Gaines ("Gaines") and F.V. Perez ("Perez") (collectively "Appellees") on his 42 U.S.C. § 1983 claims.  The appellees also cross-appeal, asking for summary judgment, instead of remand to state court, on Goodson's state law claims.  Because the district court drew conclusions of law from disputed facts, we reverse and remand.

1

## I.     Factual and Procedural Background

At approximately 11:20pm, on April 23, 1995, Gaines heard a BOLO ("be on the look out") for a white male, approximately six feet tall, heavy-set, and dressed like a cowboy, possibly heading to a cowboy bar.  The suspect had been involved in a family assault on Violet Road, in Corpus Christi, Texas.

When Gaines heard the BOLO, he was en route to investigate a complaint about loud music at a bar near Leopard and Main Streets.  Perez accompanied him in a separate car as back-up. After hearing the BOLO, Gaines noticed the hapless Goodson walking along Leopard Street.  Goodson, who is 5' 10" and weighed 260 pounds at the time,[1] wore a paint-splattered long-sleeve button-down shirt, khaki pants and a baseball hat.  The parties dispute whether he wore boots and a belt; Goodson claims to have worn velcro tennis shoes and no belt.  At this initial siting, Goodson was approximately 3 miles from Violet Road, about half a mile from the Whataburger–where he was heading to have a cup of coffee and call his brother for a ride home–and in the vicinity of The Frontier, a cowboy bar.

Gaines and Perez continued to their call on Leopard and Main Streets, determined that the music was within lawful decibel levels, and returned about 10 minutes later to the corner of Leopard and Rand Morgan Streets, where Goodson was crossing the median on his way to the Whataburger across the street.

The parties dispute virtually every aspect of the ensuing

---

[1]  Goodson has lost a significant amount of weight since his injury.

2

interaction. According to Gaines, he turned on the flashing lights on his police car, exited the vehicle and approached Goodson. Gaines says he asked Goodson for identification, which Goodson failed to produce. Instead, Goodson asked if he was under arrest. Gaines testified that he told Goodson that he was being detained because he matched the description of a suspect and again requested identification. Gaines alleges that Goodson again refused to show identification and spoke in a loud and belligerent tone. Gaines responded by telling Goodson to place his hands on the police car so Gaines could frisk him. To this, Gaines says Goodson responded, not by complying, but by asking, again, whether he was under arrest. Gaines states that he repeated that he was merely detaining Goodson and directed him to place his hands on the car. At this point, Gaines testified, Goodson began moving away, so Gaines grabbed his arm. Goodson yanked his arm away, turned and fled about 40 feet before Gaines and Perez, who gave chase, tackled him.

Goodson, on the other hand, claims that he voluntarily walked toward Gaines' car as he headed to the Whataburger. He insists that Gaines at no point asked for identification or told Goodson that he was a suspect in an assault. Rather, Goodson maintains that as he approached Gaines, Gaines barked at him to put his hands on Gaines' car. Goodson claims he was startled and asked if he was under arrest. Goodson testified that Gaines told him that he was being detained and to put his hands on the car. Before Goodson could comply, he alleges, Gaines grabbed his arm.

Goodson stated that he pulled his arm away from Gaines in surprise and stumbled back in an attempt to regain his balance and maintain a little distance from the police officers. At that point, Goodson claims, Gaines hit his body and Perez grabbed his legs, and the two felled him with their tackle.

The parties agree that Gaines and Perez broke Goodson's shoulder when they tackled him. Goodson testified that he knew his arm was broken immediately because he heard it crack when he hit the ground. Gaines and Perez rolled Goodson over to place him in handcuffs. Goodson told them his shoulder was broken, but they nevertheless jerked his arm back and cuffed him. While they were doing this, one of the officers yelled, "We'll teach you to run from us, you son of a bitch."

At 11:52pm, Gaines radioed the police station and reported that Goodson was hurt. Only a minute earlier, Officer Chris Lynch, who had issued the initial BOLO for a tall, heavy-set white man dressed like a cowboy, radioed that he had apprehended the suspect in question at The Cowboy, a bar approximately eight miles from the corner of Leopard and Rand Morgan Streets.

Goodson spent 8 days in the hospital, at a cost of almost $32,000. He needed a plate and screws inserted into his shoulder, and he will likely need his entire shoulder replaced in the future. As a result of his injury, he missed a year of work.

On May 16, 1995, through a letter written by his attorney, Goodson advised the City of his injury and claim. The City responded by prosecuting Goodson for evading detention or

4

arrest.[2]  The City filed its complaint on July 13, 1995.  Police officers arrested Goodson for this crime on November 10, 1995, while he was at a job interview.  The prosecutor eventually dismissed the case on February 24, 1997.

On April 7, 1997, Goodson filed this action in state court, alleging, inter alia, unlawful detention, illegal arrest, excessive force, malicious prosecution, improper training and supervision, and tolerance of a pattern and practice of excessive force in violation of § 1983.  The appellees removed this case to federal court on May 14, 1997.  The district court issued its order granting summary judgment on July 31, 1998.

The district court found that Goodson met the description in the BOLO.  It therefore held that Gaines and Perez had reasonable suspicion to stop Goodson, and granted Gaines and Perez qualified immunity on the unlawful detention claim.

The district court also found that Goodson pulled his arm away from Gaines and stepped away from the officers; thus, the officers had probable cause to believe that Goodson was evading a lawful detention, and qualified immunity likewise shielded Perez and Gaines from the illegal arrest claim.

The district court further held that Gaines and Perez did not use excessive force when they tackled or handcuffed Goodson so that qualified immunity protected them from liability for

---

[2]  The record contains conflicting information as to whether the charge was evading detention or arrest.  The complaint, filed on July 13, 1995, accuses Goodson of evading detention, but the dismissal of his case, on February 24, 1997, names the charge as evading arrest.  The statutory section governing the two crimes is identical.  See Tex. Penal Code § 38.04(a).

5

Goodson's injury in that respect as well.

Because the district court found that Gaines and Perez acted with probable cause when they arrested Goodson, the lower court granted the City summary judgment on that claim. It also granted the City summary judgment on Goodson's other claims because the City could not be liable for improper training and supervision or for tolerating a pattern and practice of excessive force if Gaines and Perez had committed no constitutional violations.

Goodson timely filed this appeal.

## II.   Standard of Review

We apply de novo review to summary judgment motions and evaluate the case under the same standards employed by the district court. See Shakelford v. Deloitte & Touche, LLP, 190 F.3d 398, 403 (5th Cir. 1999).

The district court should grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); see also Christopher Village, LP v. Retsinas, 190 F.3d 310, 314 (5th Cir. 1999). "An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Owsley v. San Antonio Indep. Sch. Dist., 187 F.3d 521, 523 (5th Cir. 1999), petition for cert. filed (Jan. 18, 2000) (No. 99-1205). "Although we consider the evidence and all reasonable inferences to be drawn

6

therefrom in the light most favorable to the nonmovant, the nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 505 (5th Cir. 1999), petition for cert. filed (Dec. 28, 1999) (No. 99-1090).

## III.     Discussion

Goodson claims that the district court erred when it concluded that he had not produced sufficient evidence to survive summary judgment on the qualified immunity issue.  Goodson also argues that the district court erred when it decided that Goodson had not shown a genuine issue of material fact on the issue of probable cause, which is critical to his malicious prosecution claim.  Finally, Goodson maintains that the district court erred when it denied Goodson further discovery on his claims against City and, instead, dismissed those claims.

Gaines and Perez counter that they are entitled to qualified immunity because they had reasonable suspicion for the initial stop and probable cause for the arrest, and they did not use excessive force.  The City argues that the district court correctly concluded that, because Gaines and Perez acted with probable cause, the malicious prosecution claim fails.  Finally, the Appellees insist that the district court erred when it remanded the state law claims rather than granting the appellees the summary judgment to which, they insist, they are entitled.

### A.     Qualified Immunity

7

In considering Gaines and Perez's qualified immunity claim, we must remain cognizant of the fact that the "qualified . . . immunity doctrine was established to reconcile two competing interests. One interest is the compensation of persons whose federally protected rights have been violated. Opposing this is the fear that personal liability will inhibit public officials in the discharge of their duties." Johnston v. City of Houston, 14 F.3d 1056, 1059 (5th Cir. 1994). For that reason, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Wilson v. Layne, 119 S. Ct. 1692, 1699 (1999). The doctrine is generally available to government officials sued, as Gaines and Perez here are, under § 1983. See Johnston, 14 F.3d at 1059.

The Supreme Court enunciated a two-prong test to ascertain the viability of a government official's assertion of qualified immunity in Siegert v. Gilley, 500 U.S. 226 (1991). First, we must examine whether the "plaintiff has alleged a violation of a clearly established right." Fontenot v. Cormier, 56 F.3d 669, 673 (5th Cir. 1995); see also Siegert, 500 U.S. at 231.

Second, we must ask whether the defendants' conduct was objectively reasonable in light of "clearly established" law at the time of the alleged violation. Siegert, 500 U.S. at 231-32; see also Kelly v. Foti, 77 F.3d 819, 821 (5th Cir. 1995).

8

"Objective reasonableness is a matter of law for the courts to decide[.]" Williams v. Bramer, 180 F.3d 699, 702 (5th Cir. 1999). The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law. See Gutierrez v. City of San Antonio, 139 F.3d 441, 447 (5th Cir.1998). Therefore, "[e]ven law enforcement officials who 'reasonably but mistakenly [commit a constitutional violation]' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). In terms of law being "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; see also Wilson, 119 S. Ct. at 1699.

As we explain below, we find that Goodson alleged a violation of his clearly established rights to be free from seizure without reasonable suspicion, arrest without probable cause and excessive force, and that a genuine issue of material fact exists as to whether Gaines and Perez's conduct was objectively reasonable under the circumstances. We therefore hold that, because of the disputed facts, Gaines and Perez are not entitled to qualified immunity as a matter of law.

### B.    Reasonable Suspicion for Detention

Pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968), police officers may stop and briefly detain an individual for

9

investigative purposes if they have reasonable suspicion that criminal activity is afoot. "Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion." United States v. Michelletti, 13 F.3d 838, 840 (5th Cir. 1994) (en banc). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized . . . "hunch"'. The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citations omitted). Nevertheless, "[t]his reasonable suspicion standard is less demanding than the probable cause standard[.]" United States v. Sanders, 994 F.2d 200, 203 (5th Cir. 1993).

"The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time of the decision to stop a person." United States v. Silva, 957 F.2d 157, 160 (5th Cir. 1992). "Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers[.]" United States v. Holloway, 962 F.2d 451, 459 (5th Cir. 1992).

Reasonable suspicion is a question of law, to which we apply de novo review. Silva, 957 F.2d at 159.

Here, the precise issue is whether Goodson's physical appearance fit the description of the BOLO sufficiently to give

10

rise to reasonable suspicion that he was the suspected assailant. We hold that, because Goodson's physical appearance is a disputed issue of fact, the district court could not make a determination of reasonable suspicion on summary judgment.[3]

The BOLO gave reasonable suspicion to stop and, because of the violent nature of the suspected crime, frisk a tall, heavy-set, white man dressed as a cowboy. To have reasonable suspicion to stop and frisk Goodson based on the BOLO, Gaines would have to harbor a reasonable belief that Goodson matched the description in the BOLO. If Goodson was dressed as he claims–in a paint-splattered, long-sleeved button-down shirt, khaki pants, no belt, velcro tennis shoes, and a baseball cap–then he would not have been dressed as a cowboy and would have matched the BOLO in only the vaguest of its terms.[4] The BOLO would not give Gaines reasonable suspicion to stop and frisk any tall, heavy-set, white man. Such a description would simply be too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion. See <u>United States v. Jones</u>, 619

---

[3] We emphasize that we are not confronted with a judicial determination of reasonable suspicion made in the context of a suppression hearing. When reviewing reasonable suspicion determinations made during suppression hearings, we apply clear error review to the facts and view the facts in the light most favorable to the prevailing party. See <u>United States v. Nichols</u>, 142 F.3d 857, 864-65 (5th Cir. 1998), <u>cert.</u> <u>denied</u>, 525 U.S. 1056 (1998). Here, we apply de novo review to the facts and view them in the light most favorable to the non-movant. See <u>Rushing</u>, 185 F.3d at 505.

[4] The lower court made much of the fact that Goodson weighed 260 pounds at the time of the incident. As the district court stated during the summary judgment hearing, "[T]here's just not a whole lot of 260-pound guys walking around." But the BOLO did not direct Gaines to look for a 260 pound man, or even a particularly large man. According to Gaines's affidavit, the BOLO merely stated that the suspect was "heavy-set." Thus, even if Goodson's size was a uniquely distinguishing factor, it was not one that would give rise to reasonable suspicion based on the BOLO.

F.2d 494, 497-98 (5th Cir. 1980) (finding no reasonable suspicion where the suspect matched the following partial description: "black male, 5 feet 6 inches to 5 feet 9 inches tall and weighing between 150 and 180 pounds, with a medium afro hair style, who was wearing jeans and a long denim jacket."); United States v. Rias, 524 F.2d 118, 121 (5th Cir. 1975) (finding no reasonable suspicion where the suspects matched the following description: two black men driving a black or blue Chevrolet).

Moreover, reasonable suspicion derives from particular, articulable facts and the inferences from those facts. If Goodson was dressed as he claims, at least two inferences that Gaines would have had to draw from Goodson's physical presence further undercut any reasonable suspicion that Goodson committed the assault on Violet Road. First, to have been the assailant, Goodson must have changed his clothing between Violet Road and Leopard Street. Such behavior would be very strange from someone who reportedly was heading to another cowboy bar.

Second, the assailant described by the BOLO allegedly threw his wife out of his car. Yet Goodson was walking along a desolate street, something he hardly would be doing if he had a car.[5] Therefore, to conclude that Goodson matched the BOLO, Gaines would have to infer that Goodson parked or left his car

---

[5] Gaines says he first saw Goodson walking next to a car, which Gaines assumed that Goodson had just parked, on his way to The Frontier. But any reasonable police officer, upon encountering Goodson again, still on foot, a half-mile from the car, traveling away from The Frontier and to the Whataburger, would realize that either this assumption was incorrect or Goodson was not the man described in the BOLO.

12

somewhere and began walking in a direction away from the nearest cowboy bar on a deserted street-behavior, again, that would be exceptional from an individual reportedly headed to a cowboy bar.

On the other hand, if Goodson was dressed as Gaines claims-in a long-sleeved button down shirt, khakis, cowboy boots, a belt with an over-sized belt buckle, and a baseball cap-then Goodson would have met the description in the BOLO with sufficient specificity to give rise to reasonable suspicion to stop and frisk him. The factual dispute over Goodson's physical appearance is thus crucial to the issue of qualified immunity.[6]

Additionally, one other factual dispute bears on the question of reasonable suspicion. Gaines alleges that he asked Goodson for identification twice and told Goodson that he was a suspect in an assault. Goodson's belligerent response and refusal to identify himself, Gaines says, is what led Gaines to frisk him. Goodson, on the other hand, claims that Gaines first sought to frisk him and never asked for identification or

---

[6] The appellants argue that the similarity between the facts at hand and those in United States v. Sanders warrant summary judgment in their favor. We disagree. In Sanders, a grocery store owner called the police complaining that a black male, wearing a tan jacket and blue baseball cap, was armed and behaving suspiciously on the premises. An officer arrived on the scene within 3 minutes and saw approximately 10 people outside the store, including Sanders, who alone met the grocer's description. Sanders turned and began walking away as soon as the police arrived. The officer drew his weapon, took cover, and told Sanders to stop. Another officer handcuffed Sanders and found a loaded gun in his pocket. See 994 F.2d at 201-02.

Here, unlike in Sanders, the officers confronted a man who matched the description of the suspect in only the vaguest of its terms; the BOLO did not suggest that the suspect was armed; at least ten minutes elapsed between the time when the officers first saw Goodson and when they stopped him, giving them far more time to assess their options; and the street was empty, eliminating the danger of harming bystanders. Given the multitude of difference regarding the critical facts, Sanders does not mandate summary judgment on the appellants' behalf.

revealed that Goodson might be a suspect in an assault.[7]  To have

reasonable suspicion to frisk Goodson, Gaines would have to point

to particular, articulable facts indicating that Goodson was

armed or posed a danger.  See Sanders, 994 F.2d at 203 ("A police

officer may conduct such a limited search if 'a reasonably

prudent [person] in the circumstances would be warranted in the

belief that his safety or that of others was in danger.'"

(quoting Terry, 392 U.S. at 27)).  If Goodson met the description

in the BOLO, then Gaines would have reasonable suspicion to

suspect Goodson of having committed an assault, and would

therefore have reasonable suspicion to frisk him.

If Goodson did not match the BOLO with sufficient

specificity, however, Gaines could not rely on the BOLO to

provide reasonable suspicion to frisk Goodson.[8]  Gaines could

approach Goodson, as he could approach anyone on the street, and

ask permission to ask questions or ask for identification.  See

Florida v. Bostick, 501 U.S. 429, 435 (1991) ("[E]ven when

officers have no basis for suspecting a particular individual,

they may generally ask questions of that individual . . . [and]

ask to examine the individual's identification . . . as long as

the police do not convey a message that compliance with their

---

[7]  Perez, the only other person on the scene, stood by his own patrol car during the initial exchange and thus did not hear it.

[8]  Gaines emphasizes that Goodson was both taller and heavier than Gaines or Perez, that the three stood on a deserted street, at night, and that Gaines could not tell if Goodson was armed.  Yet none of these factors give rise to reasonable suspicion to frisk Goodson.  Neither Gaines nor any other police officer could reasonably believe that he could frisk anyone, at night, on a deserted street, simply because the person was taller and heavier than the police officer.

14

request is required." (citations omitted)); United States v. Cooper, 43 F.3d 40, 145 (5th Cir. 1995) ("[A] consensual encounter . . . . may be initiated by the police without any objective level of suspicion."). Gaines could not, however, begin his encounter with Goodson by frisking him.[9] Therefore, if Gaines did ask for identification and Goodson refused, then Goodson's physical appearance has less bearing on the issue of qualified immunity; if, however, Gaines sought, without preliminary questioning, to frisk Goodson, then Gaines would have to have had reasonable suspicion, and Goodson's physical appearance is of paramount importance.

The factual disputes over Goodson's attire and Gaines's initial remarks are therefore critical to the question of qualified immunity. Though Goodson has clearly alleged a stop and frisk without reasonable suspicion, we are unable to determine whether Gaines acted in an objectively reasonable manner without resolving these factual disputes.

The lower court erred when it focused too closely on the fact that reasonable suspicion is a question of law. This is obviously true, but, even though the district court will determine at trial as a matter of law whether reasonable suspicion existed, the district court cannot draw conclusions of

---

[9]  The appellants at no point argued that Gaines did not need reasonable suspicion to stop Goodson and ask for his identification; rather, they have consistently relied on the argument that, despite the fact that Gaines had reasonable suspicion, he first asked Goodson for identification. Therefore, they have waived any argument, on this appeal, that reasonable suspicion was unnecessary to stop Goodson and ask for his identification. See Yohey v. Collins, 985 F.2d 222, 224-25 (5th Cir. 1993) ("Yohey has abandoned these arguments by failing to argue them in the body of his brief.").

15

law from disputed facts at the summary judgment phase. This principle was set forth in Johnston v. City of Houston, 14 F.3d at 1056, which squarely controls this case. There, we rejected the defendant's claim to summary judgment on the qualified immunity issue because "[d]ivergent versions of what happened have been offered by Appellants and Johnston." Id. at 1058. We held that, because "a genuine dispute as to the material and operative facts of this case exists, . . . . [s]ummary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law." Id. at 1061. See also Hart v. O'Brien, 127 F.3d 424, 432 (5th Cir. 1997) ("[W]e will not consider disputed facts in determining whether the officers had, or reasonably believed that they had, probable cause to search Hart's home or to arrest her."); Manqieri v. Clifton, 29 F.3d 1012, 1016 n.6 (5th Cir. 1994); Lampkin v. City of Nacoqdoches, 7 F.3d 430, 435 (5th Cir. 1993).

Goodson has submitted sufficient evidence suggesting that he was not dressed like a cowboy and that Gaines attempted to frisk him without any preliminary questioning to survive summary judgment on this aspect of the issue of qualified immunity. Whether Goodson's evidence is more credible than Gaines's is a question for the trier of fact. On summary judgment, we do not make such determinations; rather, we view the evidence in the light most favorable to the non-movant, here Goodson. We therefore reverse the district court's grant of qualified immunity on this issue and remand for a trial on the merits.

16

We caution that our holding today is extremely narrow.  We express no opinion as to whether Gaines and Perez acted in an objectively reasonable manner or whether they ultimately will be entitled to qualified immunity.  Our only holding is that we cannot tell, at the summary judgment stage of the case where we must view the evidence in the light most favorable to Goodson, whether Gaines and Perez acted in an objectively reasonable manner.  At trial, however, "a very different picture may result than the one painted by the summary judgment record because [Goodson] must prove the issues that this opinion assumes in his favor, and the jury can choose to credit certain facts over others, which we cannot do in reviewing a denial of summary judgment."  Gutierrez, 139 F.3d 451.

### C.    **Probable Cause for Arrest**

"Probable cause is present 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" Vance v. Nunnery, 137 F.3d 270, 276 (5th Cir. 1998) (quoting United States v. Levine, 80 F.3d 129, 132 (5th Cir. 1996)).  Gaines and Perez are entitled to qualified immunity for their arrest of Goodson if a reasonable person in their position could have believed he had probable cause to arrest Goodson for the crime of evading detention or arrest.

The statute pursuant to which Gaines and Perez arrested Goodson states, "A person commits an offense if he intentionally

17

flees from a person he knows is a peace officer attempting lawfully to arrest or detain him." Tex. Penal Code § 38.04(a). The parties dispute whether Goodson fled. But that dispute is not dispositive of the qualified immunity question at this moment. Rather, the pressing issue is whether Gaines and Perez could have reasonably believed that their detention of Goodson was lawful. Obviously, if the detention was not lawful, then even if Goodson fled, Gaines and Perez would not have had probable cause to believe that Goodson was violating § 38.04(a). Only if the detention was lawful does the dispute over whether Goodson fled become relevant.

Therefore, a genuine issue of material fact exists on the question of whether Gaines and Perez could have reasonably believed that their detention of Goodson was lawful. Just as that dispute foreclosed summary judgment on the qualified immunity issue for the reasonable suspicion claim, it likewise prevents a summary judgment grant of qualified immunity on the probable cause claim. We thus reverse the district court and remand for a trial on the merits of the probable cause claim.

## D.    Excessive Force

In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." Williams, 180 F.3d at 703.

Goodson has produced sufficient summary judgment evidence to

suggest that he suffered a broken shoulder as a result of being tackled by Gaines and Perez, who lacked reasonable suspicion to detain or frisk him and from whom he was not fleeing. A fact issue therefore exists as to the objective reasonableness of the force used. We therefore reverse the district court's grant of qualified immunity in favor of Gaines and Perez and remand for a trial on the merits.

### E.    Malicious Prosecution

"The constitutional right to be free from bad faith or malicious prosecution is 'sufficient to support a damage judgment against state law enforcement officials under 42 U.S.C. § 1983.'" Sanders v. English, 950 F.2d 1152, 1163 (5th Cir. 1992) (quoting Hand v. Gary, 838 F.2d 1420, 1424 (5th Cir. 1988)). The elements of a malicious prosecution claim are: (1) the state commences a criminal prosecution against the plaintiff; (2) the defendants caused or aided the prosecution; (3) the prosecution terminated in plaintiff's favor; (4) the plaintiff was innocent; (5) the defendants acted without probable cause; (6) the defendants acted with malice; and (7) the criminal proceeding damaged the plaintiff. See Kerr v. Lyford, 171 F.3d 330, 340 (5th Cir. 1999); Hayter, 154 F.3d at 275.

The parties only dispute element five: lack of probable cause. The City argues that because Gaines and Perez had probable cause to arrest Goodson, it cannot be liable for malicious prosecution. For the reasons stated above, whether Gaines and Perez had probable cause depends upon disputed facts

19

that preclude a grant of summary judgment in the City's favor on the malicious prosecution claim. We therefore reverse the district court on this claim and remand for a trial on the merits.

### F.        Improper Training and Supervision

The district court concluded that, because Gaines and Perez had committed no constitutional violations, no cause of action for improper training and supervision or tolerating a pattern and practice of excessive force could lie against the City. The district court therefore denied Goodson discovery on these claims. Because we reverse the district court's grant of qualified immunity to Gaines and Perez, we must also remand Goodson's claim against the City for additional discovery.

### G.        State Law Claims

We review discretionary remands pursuant to 28 U.S.C. § 1367 for an abuse of discretion. See Kennedy v. Texas Utilities, 179 F.3d 258, 265 (5th Cir. 1999). District courts, as the lower court in this case did, "may remand supplemental state law claims when [they have] dismissed the claims that provide the basis for original jurisdiction." Giles v. Nylcare Health Plans, Inc., 172 F.3d 332, 339 (5th Cir. 1999). However, where a district court erroneously dismisses the claims providing original jurisdiction, for instance, by improperly granting summary judgment, it abuses its discretion in remanding the state law claims. See Kennedy, 179 F.3d at 165. Because we reverse the district court's grant of summary judgment on the federal claims, we likewise reverse

20

its remand to state court of the state law claims, and we remand to the district court for a trial on the merits.

## IV.    Conclusion

Because the district court improperly drew legal conclusions from disputed facts, we reverse its grant of qualified immunity on summary judgment in favor of Gaines and Perez on the issues of unlawful detention, illegal arrest and excessive force, and we remand those causes of action for a trial on the merits.

Similarly, the district court erred when it dismissed Goodson's malicious prosecution claim on the ground that Gaines and Perez had probable cause to arrest Goodson.  We therefore reverse and remand for a trial on the merits.

Moreover, the district court erred when it concluded that no liability could lie against the City because Gaines and Perez had committed no constitutional violation.  We thus reverse and remand those claims for additional discovery.

Finally, the district court abused its discretion when it remanded the state law claims on the basis of an erroneous dismissal of all the claims that provided original jurisdiction. We therefore reverse the district court's remand to state court of the state law claims and remand for a trial on the merits.

REVERSED and REMANDED.