United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 15, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 02-41218

———————————————

CELIA J. CHIU; DENISE BROWN; VERONICA C. JENKINS;
DENISE KIRKE; ALFRED KIRKE; KENNETH JOHNSON,

Plaintiffs - Appellees,

versus

PLANO INDEPENDENT SCHOOL DISTRICT, ET AL.,

Defendants,

JAMES DAVIS, Doctor, Plano Independent School District,
Central Cluster Area, Assistant Superintendent; CORKY
CRISWELL, Principal, Hendrick Middle School,

Defendants - Appellants.

———————————————

Appeal from the United States District Court
For the Eastern District of Texas

———————————————

Before SMITH, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Plaintiffs-Appellees, parents of children in the Plano Independent School District

("PISD"), allege that Defendants-Appellants, employees of the PISD, prohibited them from

distributing materials critical of a proposed math curriculum at public meetings convened

specifically to discuss that curriculum. Plaintiffs-Appellees sued under 42 U.S.C. § 1983 for violation of their First Amendment rights. Defendants-Appellants filed a motion for summary judgment based on qualified immunity, which the district court granted with regard to all but two of the defendants. Those defendants, James Davis ("Davis") and Corky Criswell ("Criswell"), appeal the denial of summary judgment on their defense of qualified immunity, arguing that they did not violate the Plaintiffs-Appellees' clearly established rights of which a reasonable person would have known. We disagree and AFFIRM in part, and DISMISS in part for lack of jurisdiction.

## I. FACTS AND PROCEEDINGS

The PISD implemented a new math curriculum, the Connected Math Program ("CMP"), as a pilot program in four middle schools in the 1996-1997 school year. The CMP is a three-year pre-algebra math program directed at the sixth, seventh, and eighth grades, that teaches students to think conceptually about math problems by emphasizing problem solving, by employing group interaction, and by helping students to understand how math is applicable to their daily lives. Following an evaluation of the program, the PISD decided to introduce it at all of the middle schools in the district, starting in the 1999-2000 school year. This dispute arises from the events leading to the introduction of the CMP.

Plaintiffs Alfred Kirke ("Kirke") and Kenneth Johnson ("Johnson") are parents of children who were students in the PISD. They oppose the CMP because they believe that the new approach has not been proven to be a successful alternative to the traditional middle school math curriculum.

As a part of the process of introducing the CMP, the PISD held a series of "Parents' Math Nights" at PISD middle schools. School officials conducted the meetings on school premises after school hours and announced the meetings in a local paper and through flyers sent home with the students. Each Math Night's agenda included a presentation by faculty discussing the goals and objectives of the new CMP curriculum, a question-and-answer session, and informal breakout sessions during which parents were able to talk to individual teachers about their children.

A. The Haggard Middle School Math Night

On August 25, 1998, Kirke attended a Math Night at Haggard Middle School, where his daughter was a student. Kirke brought with him materials that were critical of the CMP and a petition requesting that the PISD halt implementation of the curriculum until they conducted an independent evaluation. The petition also requested that school officials allow more parental input in the decision making process concerning whether to choose the CMP over a traditional math curriculum.

After arriving at the Haggard Math Night, Kirke briefly discussed the CMP's controversial history with two PISD officials. He then stationed himself near the entrance to the meeting room and began passing out the materials he had prepared. Kirke initially placed his materials on a table with the materials prepared by the PISD but at some point was asked to move them to another table, so that his position would not be mistaken for the PISD's position. Kirke complied with the request and continued to pass out materials to other parents as they arrived. Kirke also claims that at some point a PISD official,

Roxanne Burleson ("Burleson"), who is not implicated in this appeal, approached him and told him to leave. Kirke refused to do so.

Once the meeting started, defendant James Davis ("Davis"), assistant superintendent for the central cluster area of the PISD, informed Kirke that he was not allowed to distribute petitions on school property and instructed Kirke to collect the petitions. Kirke did so, but continued to distribute flyers to individuals arriving late to the meeting. At that point, Davis informed Kirke that he was prohibited from distributing his flyers. Eventually, Kirke stopped distributing the flyers, because he felt as though the time for distributing flyers had passed. Following the faculty presentation, PISD officials fielded written questions submitted by attendees. Kirke chose not to submit a question, and chose to leave at the close of the question-and-answer period.

B. The Wilson Middle School Math Night

One week later, on September 1, 1998, Kirke attended the Math Night hosted at Wilson Middle School, where his son was a student. Kirke claims that because officials prohibited him from passing out flyers at the Haggard Math Night, he instead made a poster for display at the Wilson Math Night. The poster read:

> PISD officials told me that I can't pass out flyers or circulate a petition requesting a conventional math choice. For more information, see me after the meeting or call our hotline[.]

Kirke was carrying this sign when he arrived at Wilson Middle School. As he approached the door to the cafeteria in which the meeting was to be held, he encountered Davis and another PISD official. Davis informed Kirke that he would not be allowed to bring the sign

4

into the meeting. Complying with this demand, Kirke placed the sign on the table near the entrance. Kirke claims that Davis then instructed him to turn the sign face-down. After the presentation concluded, Kirke took his sign and departed.

C. The Hendrick Middle School Math Night

A similar situation unfolded at the Hendrick Middle School Math Night on October 12, 1998. Johnson brought with him a report prepared by the Texas Education Agency that evaluated the CMP textbook and found it to be "approved" but "nonconforming". Johnson handed out copies of this report to individuals who arrived prior to the meeting. As Johnson distributed his materials and spoke to arriving parents, defendant Corky Criswell ("Criswell"), the principal of Hendrick Middle School, informed him that he was not permitted to distribute material on school property unless the material had been reviewed and approved by school officials. Johnson claims that Criswell was very agitated and raised his voice. Criswell told Johnson that if he wanted to distribute his materials, he would have to do so across the street, off of school property. Following this confrontation with Criswell, Johnson ceased distributing materials.

D. The School District Speech Policies for Non-School Materials

The PISD had several policy statements that required advance notice and pre-clearance for distribution of non-school materials on school property. The specific policies at issue in this dispute are policies FMA (LOCAL) and GKA (LOCAL), which require students, parents, and community members to submit their non-school materials for approval by school officials. The FMA (LOCAL) states, in relevant part:

All written material over which the school does not exercise editorial control that is intended for distribution to students shall be submitted for prior review according to the following procedures:

1.    Materials shall be submitted to the building principal or designee for review.

2.    Using the standards at LIMITATIONS ON CONTENT[1] in policy FMA, preceding, the principal or designee shall approve or disapprove submitted material within three days of the time the materials is [sic] received. Failure to act within the three-day period shall be interpreted as disapproval.

The FMA extended to parents and community members through the PISD's policy GKA (LOCAL), which applied the same standards to distribution by these individuals on school property. It provides in relevant part:

Duplicated, written, or printed materials, handbills, photographs, pictures, films, tapes, or other visual or auditory materials shall not be sold, circulated, or distributed by persons or groups not associated with the school, on any school premises in the District, unless they have received permission in accordance with FMA (LOCAL).

---

[1]Under the LIMITATIONS ON CONTENT, the FMA policy states that material to be distributed must not: (1) be obscene or contain material sexually inappropriate for the designated audience; (2) contain libelous or slanderous statements; (3) contain criticisms of Board members or school officials that would be likely to materially and substantially interfere with normal school operations; or (4) make ethnic, religious, or racial slurs or attacks.

Another section of the FMA (LOCAL), entitled FORECAST OF DISRUPTION, provides that distribution of non-school publications may be limited if for any reason they would be likely to materially and substantially interfere with normal school operations. Under this policy, however, "bare allegations" of disruption are not sufficient and material that is merely offensive, unpopular, or that stimulates controversy shall not be restricted or forbidden.

6

Neither Kirke nor Johnson submitted their materials for approval under the PISD's prior review scheme. Davis and Criswell claim that they were enforcing school policy when they instructed Kirke and Johnson to halt their expressive activities because Kirke and Johnson had not complied with the speech policies.

E. The Present Action

On August 25, 1999, plaintiffs sued the PISD and various PISD officials, including Davis and Criswell, under 42 U.S.C. § 1983, alleging that the defendants violated their First Amendment rights to freedom of speech when they prohibited the plaintiffs from distributing literature, displaying signs, or collecting signatures on a petition at the Math Nights.

In a previous appeal, a panel of this Court reversed the denial of summary judgment to one defendant, Marilyn Brooks. The panel dismissed the appeals of the remaining defendants, including Davis and Criswell, finding that genuine issues of material fact existed to support the plaintiffs' allegations that the defendants violated their First Amendment rights. See Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 356 (5th Cir. 2001) (Chiu I). On remand, and after additional discovery, the district court entered summary judgment for all remaining individual defendants, except Davis and Criswell, on qualified immunity grounds. The district court further found that the school policies were facially constitutional, but declined to reach the question of whether they were unconstitutionally applied, although it was before the court. Davis and Criswell now appeal the district court's interlocutory order denying them qualified immunity.

7

## II. STANDARD OF REVIEW

This Court reviews the district court's denial of a motion for summary judgment based on qualified immunity de novo. See Chiu I, 260 F.3d at 342; Benningfield v. City of Houston, 157 F.3d 369, 374 (5th Cir. 1998). Summary judgment is appropriate if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When moving for summary judgment, the moving party must show that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). This Court views summary judgment evidence in the light most favorable to the nonmovant, with all factual inferences drawn in the nonmovant's favor. Behrens v. Pelletier, 516 U.S. 299, 309 (1996). This Court will affirm the denial of summary judgment based on qualified immunity if the moving party is not entitled to judgment as a matter of law. See Chiu I, 260 F.3d at 342 (citing FED. R. CIV. P. 56(c); Celotex, 477 U.S. at 322). However, this Court may not review a district court's conclusion that issues of fact are genuine. See Reyes v. City of Richmond, 287 F.3d 346, 350 (5th Cir. 2002).

## III. DISCUSSION

A. Qualified Immunity

8

As a general matter, the qualified immunity doctrine shields public officials acting within the scope of their official duties. Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982). However, the qualified immunity doctrine only protects officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818.

This Court applies a two-prong analysis to determine whether a public official is entitled to qualified immunity. First, the Court must determine whether the plaintiff has alleged a violation of a clearly established right. Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000). This Court has refined this first step into three separate components:

> First, the plaintiff must allege the deprivation of a constitutional right. Second, [the court] must determine whether this right was clearly established at the time of the alleged violation. Finally, [the court] must determine whether the record at least gives rise to a genuine issue of material fact as to whether the defendants actually engaged in the conduct that violated this clearly established right.

Chiu I, 260 F.3d at 343 (quoting Wallace v. Wellborn, 204 F.3d 165, 167 (5th Cir. 2000)). Second, the Court must determine "whether the defendants' conduct was objectively reasonable in light of 'clearly established' law at the time of the violation." Goodson, 202 F.3d at 736 (quoting Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)).

B. First Amendment Analysis

Under the first prong of the qualified immunity analysis this Court must determine the threshold question of whether Kirke and Johnson have alleged a violation of a clearly

9

established right.  Siegert, 500 U.S. at 231.  Kirke and Johnson maintain that Davis and Criswell infringed on their First Amendment rights when they interfered with Kirke and Johnson's speech and expressive activities at the various Math Nights.  Kirke and Johnson contend that Criswell and Davis violated their clearly established rights by prohibiting them from distributing flyers, posting a sign, and circulating a petition pursuant to the school's speech policy, GKA (LOCAL).  Furthermore, Kirke and Johnson assert that Davis and Criswell's actions were objectively unreasonable in light of the established law at the time, thereby satisfying the second prong of the qualified immunity analysis.

1.  Protected Expression

As an initial matter, we agree with the prior panel in Chiu I, which found that Kirke and Johnson's speech and expressive activities were constitutionally protected under the First Amendment.  See Chiu I, 260 F.3d at 343-44.  The subject matter of Kirke and Johnson's materials concerned a debate over a change in public school curriculum, an issue of public concern for parents of children enrolled in the PISD.  Id. at 344.  The activities in which Kirke and Johnson engaged—specifically, speaking, leafletting, circulating petitions, displaying signs, and disseminating literature on matters of public concern—are activities that are considered fundamental First Amendment rights.  See id. (citing Schenk v. Pro-Choice Network, 519 U.S. 357, 377 (1997) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment."); Boos v. Barry, 485 U.S. 312, 318 (1988) (recognizing that signs on matters of public concern are classic examples of free speech); Meyer v. Grant, 486 U.S. 414, 422 n.5 (1988) (noting

10

that the solicitation of signatures for a petition drive involves protected speech); Martin v. City of Struthers, 319 U.S. 141, 143 (1943) (emphasizing that the right to freedom of speech "embraces the right to distribute literature, and necessarily protects the right to receive it")). Neither party contests that Kirke and Johnson's activities were unprotected by the First Amendment; as such, we turn to the alleged viewpoint discrimination and the constitutionality of the speech regulations implicated by Kirke and Johnson's allegations.

### 2. Clearly Established Right

Because we conclude that Kirke and Johnson have alleged the deprivation of a constitutionally protected right, we next address whether their rights were clearly established at the time Davis and Criswell allegedly interfered with their protected expressive activities at the Math Nights.

#### a. Viewpoint Discrimination

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995). As such, as the Chiu I panel found, regardless of whether the Math Nights were public forums, government actors violate a clearly established right if they discriminate on the basis of the views espoused by the speaker. Chiu I, 260 F.3d at 351 (citing Hobbs v. Hawkins, 968 F.2d 471, 481 (5th Cir. 1992)). Thus, if Davis and Criswell engaged in viewpoint discrimination, it violated Kirke and Johnson's clearly established First Amendment rights.

#### b. School Policies as Prior Restraints

11

It has long been held that ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official—are unconstitutional burdens on speech classified as prior restraints. Staub v. City of Baxley, 355 U.S. 313, 322 (1958). The prohibition of distributing literature is a classic form of a prior restraint. See Lovell v. Griffin, 303 U.S. 444, 450-52 (1938). A prior restraint, while not per se unconstitutional, bears a heavy presumption against its constitutional validity. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558 (1975); Bantam Books v. Sullivan, 372 U.S. 58, 70 (1963); see Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992). It is clear, however, that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Southeastern Promotions Ltd., 420 U.S. at 553 (quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150-51 (1969)); see also Forsyth County, 505 U.S. at 130 (noting that a licensing scheme for use of a public forum for speech that acts as a prior restraint is constitutional so long as it does not delegate broad licensing authority to a public official; and noting that if the scheme regulates time, place, and manner, then it must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication). A party enforcing a prior restraint "carries a heavy burden of showing justification for the imposition of such a restraint." Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971).

Over thirty years ago, in Tinker v. Des Moines Independent Community School

12

District, the Supreme Court stated: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  393 U.S. 503, 506 (1969).[2]  Further, the Court noted that while First Amendment protection was afforded to students and teachers, it did not extend to speech that "materially disrupt[ed] classwork or involv[ed] substantial disorder or invasion of the rights of others".  Id. at 513.

The tenets set forth in Tinker are undoubtedly what this Court contemplated when it struck down, as unconstitutionally applied and facially unconstitutional, a school policy that acted as a prior restraint on student speech in Shanley v. Northeast Independent School District, Bexar County Texas, 462 F.2d 960 (5th Cir. 1972) (noting that "the purpose of any screening regulation . . . is to prevent disruption and not to stifle expression").  The school speech policy in Shanley required students to obtain prior administrative approval of any materials that were intended for distribution.  Id. at 964-65.  It had no limits with regard to time, place, or content of the materials, nor did it have a provision for appeal of the administrator's decision.  The school board applied the virtually standardless speech policy to suspend students who produced and distributed an "underground" newspaper off of school grounds, outside school hours.

In finding that the school policy was an unconstitutional prior restraint as applied,

---

[2]Although parents' speech was not at issue in Tinker, in holding that students and teachers had First Amendment protection within the confines of a school building, it cited to numerous cases in which it reaffirmed a parent's fundamental liberty interest in directing his or her child's education.  See Tinker, 393 U.S. at 505 (citing, e.g., Pierce v. Society of Sisters, 268 U.S. 510 (1925); Meyer v. Nebraska, 262 U.S. 390 (1923)).

this Court noted that the content of the newspaper,[3] although controversial, did not fall within a category of generally unprotected speech, such as material that is libelous, obscene, or inflammatory. See id. at 971-72. In deference to the school board, however, this Court noted that it would only require that the school board demonstrate reasonableness in its regulation. Further on that point, this Court stated that "the school board's burden of demonstrating reasonableness becomes geometrically heavier as its decision begins to focus upon the content of materials that are not obscene, libelous, or inflammatory." Id. at 971. Moreover, this Court found that the distribution of the paper off school grounds and outside school hours did not cause a single disruption of school activity or discipline during school hours, nor did the school board show that it could reasonably forecast such a disruption arising from its distribution. Id. at 974. Thus, even in schools there exists a clearly established right to be free of prior restraints except where they are designed to maintain discipline or to prevent school disruption and are narrowly drawn to achieve that goal.

3. Genuine Issue of Material Fact

Having established that Kirke and Johnson have alleged a deprivation of a clearly established right, we next turn to the question of whether the record at least gives rise to a genuine issue of material fact as to whether Davis and Criswell actually engaged in the

---

[3]The objectionable content in the underground newspaper, "Awakenings," included an article on alternative views regarding marijuana laws, and information for a free clinic in town that would give information on birth control. See Shanley, 462 F.2d at 972 n.9.

14

conduct that violated this clearly established right. "A factual dispute is 'genuine' where a reasonable party would return a verdict for the non-moving party." Lukan v. North Forest Indep. Sch. Dist., 183 F.3d 342, 345 (5th Cir. 1999) (citing Crowe v. Henry, 115 F.3d 294, 296 (5th Cir. 1997)).

### a. Viewpoint Discrimination

As the panel in Chiu I concluded, and as the district court later found, there is a genuine issue of material fact to show that Davis and Criswell actually engaged in the viewpoint discrimination alleged by Kirke and Johnson. See Chiu I, 260 F.3d at 351. With regard to Davis, the district court highlighted the e-mail that he allegedly authored on August 26, 1998, which the court found raised a genuine issue of material fact tending to show that Davis engaged in viewpoint discrimination. That e-mail stated:

> I want to alert all of you of [sic] our district legal position regarding people coming on to [sic] your campus with petitions and material associated with the Connected Math Program. You are not to allow anyone to come on your campus, inside or out, to circulate a petition or pass out material related to the Connected Math Program. The recent flap over the Connected Math Program has prompted some people to conduct personal campaigns supporting one side or the other. I think they will seek support wherever they can find it, including schools not using the program. Don't get caught napping on this one.

However, as the district court further noted, there remains a question as to whether Davis actually authored the e-mail, and whether Criswell was a recipient.

There is also the question of whether Davis and Criswell applied the school speech policies in a viewpoint discriminatory fashion. For instance, at the Haggard Math Night Haggard Middle School principal, Burleson, first allowed Kirke to distribute his materials,

15

including leaving them on a table for distribution and handing them out to parents arriving late to the meeting. If the GKA (LOCAL) policy expressly forbade such distributions, it seems odd that Burleson would have initially permitted Kirke to engage in such activity. At the very least, this creates a genuine issue of material fact as to Davis and Criswell's motivations for not allowing the distributions.

Viewing the evidence in the light most favorable to Kirke and Johnson, we conclude that there is a genuine issue of material fact as to whether Davis and Criswell engaged in viewpoint discrimination. As such, we are deprived of jurisdiction to decide the appeal on these grounds.

b. School Policies as Prior Restraints

Here, the school policy, specifically GKA (LOCAL), is indistinguishable in its effect from a prior restraint. The district court, considering this question with regard to Kirke and Johnson's declaratory judgment claim, ruled that the school policies were not facially unconstitutional, and it declined to consider whether the policies were unconstitutional as applied. Johnson and Kirke raised the prior restraint argument with regard to the qualified immunity issue; however, the district court failed to address it. On appeal, Kirke and Johnson contend that the school policies are unconstitutional prior restraints on protected speech.[4] This Court may affirm on grounds other than those relied upon by the district court. Ballard v. United States, 17 F.3d 116, 118 (5th Cir. 1994). Because we review

_____

[4]Davis and Criswell do not address this argument. Curiously, although this case is before us on de novo review, they maintain that we are bound by the district court's determination that the school policies are not unconstitutional prior restraints.

16

this case de novo, we find that the school policies are unconstitutional as applied, and consequently, the district court was ultimately correct in denying both Davis and Criswell qualified immunity.

It is evident that the school speech policy here is unconstitutional as applied to plaintiffs. First, the content of Kirke and Johnson's speech and expressive activity was a matter of public concern, and did not remotely fall under a category of generally unprotected speech. Thus, the school board's burden of demonstrating the reasonableness of its blanket requirement that students, members of the community, and parents at a parents-only after school program have all distributions pre-cleared—regardless of the time of day of distribution—is substantially heavier. Shanley, 462 F.2d at 971. Because Kirke and Johnson's speech and expressive activity took place outside school hours, and because Davis and Criswell presented no evidence that the flyers, petition, or sign created a disruption of "normal school operations," or that there was a reasonable probability of such disruption, the nexus between the school's legitimate interest in maintaining order and discipline on school grounds and the blanket pre-clearance requirement is non-existent. Moreover, the justification expressed by the district court, that the flyers could end up in students' hands, is not convincing. A regulation that acts as a prior restraint must be narrowly drawn. United States v. Brown, 218 F.3d 415, 425 (5th Cir. 2000). Here, a simple requirement that parents who distribute flyers at a meeting collect them at the end of the meeting, would be a sufficient and more narrowly-drawn way to meet the interests of maintaining discipline on school grounds and allowing parents their right to

speak on a matter of public concern.

### 3. Objective Reasonableness

Although Davis and Criswell violated Kirke and Johnson's clearly established rights, they are nonetheless entitled to qualified immunity if they can show that their actions were objectively reasonable. Lukan, 183 F.3d at 345. "A defense of qualified immunity can be overcome only if an objectively reasonable officer would know that his conduct was illegal given the facts available to him at the time of his action and the law that was clearly established at the time of the alleged illegal acts." Hays County Guardian v. Supple, 969 F.2d 111, 125 (5th Cir. 1992).

### a. Viewpoint Discrimination

Discrimination against speech because of its message is presumptively unconstitutional. Turner Broad. Sys. Inc. v. FCC, 512 U.S. 622, 641-42 (1994). Accordingly, an objectively reasonable school official would know that engaging in viewpoint discrimination with regard to a parent's protected expression is forbidden by the First Amendment. Yet, determining whether Davis and Criswell acted in an objectively reasonable manner involves resolution of fact issues that are unreviewable in this interlocutory appeal. As such, we lack jurisdiction to determine this aspect of Davis and Criswell's claim of qualified immunity.

### b. Prior Restraint as Applied

Because the school speech policy is an unconstitutional prior restraint as applied here by Davis and Criswell, it is a violation of Kirke and Johnson's clearly established

18

rights.  Davis and Criswell claim that they enforced the school policy in good faith, and as such, their actions were objectively reasonable.  However, if Davis and Criswell knew or should have known at the time they acted that their actions would infringe on Kirke and Johnson's clearly established rights, their actions are unconstitutional despite their sincere subjective belief that they were acting in good faith.  Barker v. Norman, 651 F.2d 1107, 1120 (5th Cir. 1981).

Davis and Criswell's enforcement of a school speech policy that was an unconstitutional prior restraint as applied was objectively unreasonable.  As discussed above, Shanley specifically emphasized that a school speech policy must be justified on the basis of maintaining school order and discipline.  Because Davis and Criswell cannot contend that the application of GKA (LOCAL) to parents at a parents-only after-school meeting had a significant bearing on the educational environment, the policy was obviously unconstitutional.  Consequently, Davis and Criswell's enforcement of that policy against Kirke and Johnson, regardless of their subjective intent, was objectively unreasonable.

## IV.  CONCLUSION

For the foregoing reasons, we conclude the district court was correct in finding that there is a genuine issue of material fact that both Davis and Criswell should be denied qualified immunity because they engaged in viewpoint discrimination.  As such, we DISMISS this issue for want of jurisdiction.  However, because we conclude that the school policies are unconstitutional prior restraints as applied, we AFFIRM the district court's

19

denial of Davis and Criswell's motion for summary judgment on qualified immunity.