IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2008

Charles R. Fulbruge III
Clerk

No. 05-10890

MICHAEL BIAS

Plaintiff-Appellee

v.

LESLIE WOODS, et. al,

Defendants

NENITA SABATER

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:99-CV-33

Before DeMOSS, DENNIS, and OWEN, Circuit Judges.

DeMOSS, Circuit Judge:[*]

Defendant-Appellant Nenita Sabater, M.D. appeals the district court's final judgment holding that (1) she is not entitled to qualified immunity with respect to the 42 U.S.C. § 1983 claim brought against her by Plaintiff-Appellee

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Michael Bias for violations of his Eighth Amendment right to be free from cruel and unusual punishment, and (2) she is liable under § 1983 for Bias's injuries. We affirm.

## I. Background Facts

Bias arrived at the Texas Department of Criminal Justice's (TDCJ) Allred Unit on May 1, 1997, with a history of at least one suicide attempt. Dr. Sabater was his treating psychiatrist. She diagnosed Bias with clinical depression and prescribed him anti-depressant and anti-psychotic medications. During his stay at the Allred Unit, Bias repeatedly told Dr. Sabater and her staff that he was having suicidal thoughts. Bias specifically stated that he had a "suicide plan," although he indicated to Dr. Sabater's staff that he would not follow through with his plan for at least one month. On May 20, 1997, Bias attempted suicide by slashing his left wrist and taking an overdose of seven different medications that he had collected from daily pill call and saved since his arrival in the Unit.[1]

Following his suicide attempt, officers placed Bias in a suicide-watch cell with no clothing and nothing but a "suicide blanket." Clinic notes from May 20, 1997, state that Bias was "sitting on the side of the bed" and was "awake, alert, and co-operative." In the early morning hours of May 21, 2007, Bias was "lethargic" but was made "easily alert" with an ammonia inhalant. The clinic notes go on to state that, at this time, Bias "denie[d] taking meds other than his own [and] states he takes meds only as prescribed." On May 21, 1997, approximately twelve to sixteen hours after Bias's suicide attempt, Dr. Sabater first became aware of Bias's unconscious or near-unconscious condition. She concluded that he was "suffer[ing] from severe depression and that he was withdrawn and did not want to talk." That same day, she recommended that

---

[1] Although medical records indicate that Bias had seven different medications in his body following the suicide attempt, Dr. Sabater had only prescribed him two medications. There is nothing in the record to explain how Bias obtained the five additional medications.

Bias be transferred to the Montford Unit, the TDCJ's psychiatric facility. However, for reasons that are unclear, Bias was actually transported 150 miles from the Allred Unit to the Robertson Unit.[2]

A videotape recorded on May 22, 1997, showed Bias being prepared for transport from the Allred Unit. The video is approximately twenty minutes long and initially shows Bias lying on his back, apparently naked, on a "suicide blanket" on the floor. The video shows several correctional officers attempting to rouse Bias to prepare him for transport by telling him to "wake up" and "open [his] eyes." Bias's only responses were to tilt his head to the side and raise his head slightly. Officers attempted to awaken Bias with an ammonia capsule, which resulted in only a groan and some slight movement. Bias appears motionless at all other times throughout the duration of the tape. An officer can be heard asking whether they should "get a nurse to make sure nothing [was] wrong with him" and stating that Bias "can't even hold himself up." Because Bias was unconscious, the officers had to lift Bias into a sitting position in order to dress him and place leg irons and handcuffs on him, a process which took approximately ten minutes. Dr. Sabater appears intermittently on the videotape to supervise Bias's preparation for transport. Bias's vital signs were checked during this time and were normal.

Officers placed Bias in the transport van, on his back, in a confined space on the floor that appeared to be just smaller than Bias's shoulder width. During the transfer, Bias "did not awaken or move." Curtis Cooper, associate clinical

---

[2] At least one of the district court's findings was clearly erroneous: the court determined that Bias was transported to the Robertson Unit "at the direction of Dr. Sabater." However, it is undisputed that Dr. Sabater intended to have Bias sent to the psychiatric facility at the Montford Unit. Despite Dr. Sabater's instructions to transfer Bias to the Montford Unit, he was actually transferred to the Robertson Unit. There is nothing in the record to fully explain this discrepancy. However, Officer Dalton Agnew, one of the officers in the transport van, stated that the "paper work said they were en route to the Montford Unit for Psych. appointments," indicating that the Robertson Unit was a stop on the way to the Montford Unit.

psychologist at Allred, told investigators that the ammonia capsule "was of little or no help" in awakening Bias immediately prior to his placement in the van. Linda Barnaby, nurse at the Robertson Unit, stated that upon arrival, Bias was "not responsive to verbal stimuli nor painful stimuli," such as a chest rub or eye lash flick. Almost immediately after Bias's arrival to the Robertson Unit, he was transported to Hendrick Medical Center for an apparent drug overdose. The Trauma Center Note stated that Bias had been "[un]responsive. . . for at least the last 24 hours" and was in a "comatose state." Bias showed signs of multi-system organ failure, but gradually became alert after several days in intensive care.

As a result of being transported in an unconscious or nearly unconscious state on the floor of a van without being moved, Bias suffered a compression injury resulting in necrosis and infection in his right hip, buttocks and thigh. Medical records indicated that he suffered a wound approximately ten inches in diameter that required skin-graft surgery. According to Bias, the injury left "permanent disfigurement." Bias testified that he lost the skin from his right leg up to his hip, that there remained a hole in his right gluteus maximus, that his right buttock is gone, and that he cannot sit or stand too long because of the nerve damage and muscle loss. The district court viewed Bias's right hip, thigh, and leg and confirmed that he had suffered substantial physical injury. Dr. Sabater does not dispute that Bias's transportation in an unconscious state caused his injuries.

## II. Procedural History

In 1999, Bias filed pro se a lawsuit pursuant to 42 U.S.C. § 1983 against three wardens (Leslie Woods, Earl Fox, and Ray Castro), Dr. Sabater, and several unknown officers, all of whom worked in the Allred Unit of the TDCJ. Bias asserted that the defendants had acted with deliberate indifference to his

serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. See U.S. CONST. amend. VIII.

The district court dismissed Bias's suit as frivolous, but did so without prejudice. In January 2000, this Court affirmed the dismissal of the claims against the wardens, vacated the judgment with respect to the dismissal of the claims against Dr. Sabater and the unknown defendants, and remanded the case for further proceedings. See Bias v. Woods, No. 99-10709, 2000 WL 122419 (5th Cir. Jan. 31, 2000). After further proceedings irrelevant to this appeal, the district court dismissed Bias's claims against all defendants except Dr. Sabater.

Dr. Sabater filed a motion for summary judgment, arguing that Bias had failed to exhaust administrative remedies, that she was entitled to qualified immunity, and that Bias had failed to state a constitutional violation. The district court denied Dr. Sabater's motion on July 8, 2002. That same day, the court held a bench trial on Bias's claim against Dr. Sabater. In an order dated July 26, 2002, the district court determined that Dr. Sabater was liable for Bias's injuries, and Dr. Sabater appealed. In October 2003, this Court dismissed Dr. Sabater's interlocutory appeal for lack of jurisdiction, concluding that the district court's judgment was not final because damages had not yet been determined. See Bias v. Woods, 78 F. App'x 951 (5th Cir. 2003).

On remand, the district court held a hearing on damages and awarded Bias: $103,800.00 in compensatory damages for physical pain and suffering, mental anguish, and emotional distress; attorney's fees; costs; and interest. Dr. Sabater timely appealed.

## III. Analysis

On appeal, Dr. Sabater argues that the district court erred in denying qualified immunity because: (1) Bias failed to allege a violation of a clearly established constitutional right; (2) Dr. Sabater's conduct was objectively

reasonable in light of the clearly established law;[3] and (3) Bias failed to state or prove a claim other than negligence.

We review a district court's conclusions of law de novo. See Water Craft Mgmt. LLC v. Mercury Marine, 457 F.3d 484, 488 (5th Cir. 2006). We may not set aside a district court's factual findings unless it is clearly erroneous.  See Crawford v. Falcon Drilling Co., Inc., 131 F.3d 1120, 1124 (5th Cir. 1997); FED. R. CIV. P. 52(a).

Government officials performing discretionary functions are protected from civil liability under the doctrine of qualified immunity if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." See McClendon v. City of Columbia, 305 F.3d 314, 322 (5th Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Federal courts apply a two-step analysis to qualified immunity claims. See Saucier v. Katz, 533 U.S. 194, 201 (2001). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Scott v. Harris, 127 S.Ct. 1769, 1774 (2007) (quoting Saucier, 533 U.S. at 201). If the answer is yes, the court inquires whether the officer's conduct was objectively reasonable in light of the law that was "clearly established" at the time of the alleged violation. Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000).

Bias argues that Dr. Sabater violated his constitutional right to be free from cruel and unusual punishment. See U.S. CONST. amend. VIII. The Cruel and Unusual Punishment Clause allows an inmate to obtain relief after being

---

[3] Dr. Sabater separately questions whether the relevant law was "clearly established," but that question is part and parcel of the objective reasonableness analysis. See Williams v. Kaufman County, 352 F.3d 994, 1002 n.12 (5th Cir. 2003) ("The district court, however, unnecessarily decoupled the clearly established/objective unreasonableness test of the Supreme Court. That is, if a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable.").

denied medical care if he proves that there was a "deliberate indifference to [his] serious medical needs." Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Deliberate indifference requires a showing that Dr. Sabater (1) was "aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn," and (2) that she "actually drew an inference that such potential for harm existed." Herman v. Holiday, 238 F.3d 660, 664 (5th Cir. 2001). Such a showing requires evidence that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wonton disregard for any serious medical needs." Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001) (quoting Estelle, 429 U.S. at 107). A prisoner's disagreement with his medical treatment is not actionable under § 1983 absent exceptional circumstances. See Banuelos, 41 F.3d at 235. Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk. Farmer v. Brennan, 511 U.S. 825, 842 & n.8 (1994). "[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." Id. at 844.

After applying the facts to the relevant legal standards, the district court made the following findings: Dr. Sabater was not entitled to qualified immunity because "a reasonable person would have known that her conduct in ordering the transportation of an inmate in Bias'[s] condition to a prison unit 150 miles away, rather than providing immediate medical attention, would cause a significant delay, if not a complete denial, of medical care;" Bias's medical condition on May 22, 1997, was "open and obvious" and "an exceptional circumstance obviously requiring immediate medical attention;" Dr. Sabater "was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed;" Dr. Sabater "actually drew that inference;" and "her intentional failure

to act caused a prolonged delay in medical care and resulted in substantial injury to Michael Bias;" and Dr. Sabater was "deliberately indifferent" to Bias's "serious medical needs" and her conduct resulted in his injuries.

After thoroughly reviewing the briefs and relevant portions of the record, we find no clear error in the district court's factual findings and affirm for essentially the same reasons stated by the district court in its written order. AFFIRMED.

DENNIS, Circuit Judge, specially concurring.

I fully concur in the correct and well crafted majority opinion and write further only to emphasize certain facts and legal principles that additionally support its conclusion.

Having reviewed the record in this case, including the much-discussed videotape, I cannot conclude that the district court clearly erred in finding that Bias's helpless, unconscious condition obviously required either immediate treatment or continuing medical attendance, that Dr. Sabater knew of and understood this condition, and that Dr. Sabater deliberately placed Bias in a situation in which she knew that he would receive no medical (or even medical technician) attention for several hours by approving his transportation, unconscious and horizontally crammed on the floor of a van not equipped for non-ambulatory patient use. The record also confirms that when Bias arrived at the Robertson unit, after several hours of unconsciously enduring his dangerously inadequate transportation conditions, he was immediately sent to a hospital emergency care facility, where he was not only immediately diagnosed as suffering from a drug overdose but also found to suffer from necrosis as a result of being cramped in the van unconscious and on his back and side for several hours. Finally, the record shows that this transport-induced injury led to Bias's need for multiple surgeries and to the loss of his right buttocks, inter alia. Thus, my study of the record, including Bias's compiled medical records, has confirmed my agreement that we should affirm the district court's judgment because we cannot say that it is clearly erroneous.

To prove "deliberate indifference" Bias needed to demonstrate two elements: (1) that Dr. Sabater was subjectively aware of a substantial risk to Bias's health, and (2) that Dr. Sabater disregarded that risk. See Farmer v. Brennan, 511 U.S. 825, 842 (1994) (holding that an "Eighth Amendment claimant" need only show "that the official acted or failed to act despite his

9

knowledge of a substantial risk of serious harm"); see also Gobert v. Caldwell, 463 F.3d 339, 348-49 & n.29 (5th Cir. 2006). Since the first element inquires only into Dr. Sabater's subjective knowledge of a substantial risk, Bias was able to meet the prong without supplying expert testimony. See Gobert, 463 F.3d at 348 n.29 ("As we must focus on [the doctor's] subjective knowledge, expert testimony cannot create a question of fact as to what [the doctor] actually knew."). In fact, because "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," Farmer, at 842, Bias satisfied this element and allowed the factfinder to infer Dr. Sabater's subjective knowledge simply by demonstrating the obviousness of his condition and its risks. See Harris v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999). Similarly, Bias need not have provided expert testimony to establish the second element of his deliberate indifference claim; he met the second prong by presenting evidence allowing the trier of the facts to infer that Dr. Sabater, by acting or failing to act, disregarded a known substantial risk. See Gobert 463 F.3d at 349; see also Farmer, 511 U.S. at 842.

Here Bias alleged and introduced evidence of facts sufficient to prove these elements of deliberate indifference, and the district court, acting as fact-finder, found the evidence, as discussed above, sufficient to rule in Bias's favor.

We may not set aside a district court's factual finding unless it is clearly erroneous, see Crawford v. Falcon Drilling Co., Inc. 131 F.3d 1120, 1124 (5th Cir. 1997) (citing Fed. R. Civ. P. 52(a)), and based on my review of the record, I see no clear error here. The district court could have reasonably and correctly inferred from the record and video that Bias was in need of medical attention. The video documents twenty minutes of Bias's completely unconscious, limp body, which could not easily have been malingering. Given that Bias had attempted suicide and had been slipping in and out of consciousness for nearly

three days, at the very least, Bias's obvious, unconscious state required monitoring, and from the conspicuousness of this condition, the district court could reasonably have inferred that Dr. Sabater subjectively appreciated as much.[1]

Further, the record shows no clear error in the district court's determination that Dr. Sabater's actions amounted to a denial or delay of medical care to Bias. By approving Bias's transport in an ordinary van, Dr. Sabater terminated Bias's access to any medical treatment or attention; despite his condition, she isolated him in a cramped space for multiple hours. It is well within reason for the district court to have concluded that such constitutes a disregard for the substantial risks to Bias's health. This conclusion is bolstered by the fact that when Bias finally arrived at the Hendricks Medical Center and received proper treatment, he was immediately diagnosed as suffering from a drug overdose, as well as necrosis and other physical injuries he did not have when Dr. Sabater had him crammed into the van. So while Bias's condition may not necessarily have required a doctor constantly present, his comatose state did merit attention by some physician or medical technician, and Dr. Sabater's order not only denied him such attention but also caused him further injury as a result of his three-hour transportation ordeal.

---

[1] Dr. Sabater never testified at trial that she believed Bias to be "faking," but the record contains statements from prison officials involved in Bias's preparation for transport that report Dr. Sabater's making such "faking" accusations. See ROA vol. 2 p. 285; vol 6 p. 9; vol 6 p. 72-74. In light of the video, though, such a "faking" diagnosis is highly implausible. Thus, record evidence would allow the district court to discredit any assertion that Bias was merely faking and to conclude that Bias's obviously serious condition was known to Dr. Sabater.

Moreover, further record evidence also supports the conclusion that the seriousness of Bias's condition was obvious; for example, each doctor to examine Bias after his multiple-hour transport noted the seriousness of his condition. See, e.g., ROA vol. 2 p. 289-90; ROA vol. 1 p. 178-79. In fact, Dr. Jackson, who examined Bias after he was rushed from the Robertson unit to Hendrick Medical Center, observed that he suspected, correctly, that Bias had been hoarding medications and that his condition was caused by an overdose. See ROA vol. 2 p. 289-90.

Thus, I concur in finding that we should affirm the district court's judgment, and I cannot agree that expert testimony was necessary to prove this particular case. As discussed above, Farmer, 511 U.S. at 842, and Gobert, 463 F.3d at 348 & n.29, show that no expert testimony is needed to establish deliberate indifference in a case such as this because expert testimony cannot reveal Dr. Sabater's subjective knowledge and is unnecessary to establish that Dr. Sabater's actions amount to a disregard for Bias's condition. Also, Estelle v. Gamble, 429 U.S. 97, 107 (1976), the case cited by the dissent in support of the proposition that Bias's claim must be bolstered by expert testimony, appears to hold only that expert testimony is preferred as a general rule, and I find that Bias's obvious and emergent condition distinguishes the present case from Estelle.[2]

In sum, I find that the district court's judgment was not clearly erroneous. The trial judge heard testimony, watched the videotape, and made the credibility evaluations. The record shows that this determination was not clearly erroneous, so we are bound to affirm.

---

[2] In Estelle v. Gamble, 429 U.S. 97, 107 (1976), the plaintiff complained of "lack of diagnosis and inadequate treatment of his back injury," specifically contending that his doctors should have x-rayed his back. Id. Though the plaintiff's medical condition in Estelle may have been quite painful, id. at 99-100, it was not emergent or life threatening, and the Plaintiff received continuous treatment over a three-month period. Id. at 107.

Unlike that case, Bias's comatose or near-comatose condition obviously evidenced a need for immediate attention or monitoring, but Dr. Sabater's orders isolated him from any such attention for a critical period of hours. In fact, had Dr. Sabater's orders been followed exactly, Bias would have been without medical attention for even longer. Dr. Sabater ordered and approved Bias's transport from the Allred Unit, near Wichita Falls, Texas, to the Montford Unit, near Lubbock, Texas; the distance between these two locations is roughly 200 miles. Bias was actually transported only roughly 150 miles from the Allred Unit to the Robertson Unit in Abilene, Texas.

PRISCILLA R. OWEN, Circuit Judge, dissenting.

I respectfully dissent because there is absolutely no evidence that Dr. Sabater was negligent in her diagnosis and treatment of Michael Bias, much less evidence that Sabater was deliberately indifferent to a substantial risk of serious harm to Bias.[1]  This is not a case in which we are evaluating a plaintiff's Complaint to see if it withstands a motion to dismiss.  There has been a trial on the merits, and the district court found Sabater liable based on the testimony of Bias, who is a layman, and a 20-minute videotape, from which the district court concluded that Bias's condition "immediately prior to his transport out of the Allred Unit, was open and obvious."  There was no expert testimony or expert opinion that Bias's condition was such that a reasonable health-care provider would have recognized that transporting Bias in a van to a psychiatric unit in another prison facility presented a risk of serious harm.

I do not take the position that expert testimony is required in every case in which it is alleged that a physician was deliberately indifferent to a patient's condition.  But here, Dr. Sabater examined Bias and monitored him.  At least two other health-care professionals were present during that assessment and monitoring.  Sabater may have misdiagnosed Bias's condition, although there is no evidence that she did or that if she did, it amounted even to negligence.  But misdiagnosis is not withholding treatment nor is it treatment that is consciously indifferent to a substantial risk of serious harm.  Whether it would have been obvious to a reasonable physician that transporting Bias to another unit in a van presented a substantial risk of serious harm requires an expert's analysis.  Bias, a layman and the only witness he called at trial, cannot provide that analysis,

---

[1] See Farmer v. Brennan, 511 U.S. 825, 828 (1994) (holding that a prison official violates the Eighth Amendment only if she is deliberately indifferent "to a substantial risk of serious harm to an inmate.").

nor can federal judges, learned though they may be. The record in this case simply does not support a finding of deliberate indifference.

The district court's opinion reflects that Dr. Sabater's liability was predicated on three conclusions. The first was, "[t]he Court finds that a reasonable person would have known that her conduct in ordering the transportation of an inmate in Bias' condition to a prison unit 150 miles away, rather than providing immediate medical attention, would cause a significant delay, if not a complete denial, of medical care." The record is devoid of any evidence that Bias required immediate medical attention or that transporting him 150 miles would subject him to a substantial risk of injury. Only a health care expert could make such an assessment in this case, and there was no expert testimony or opinion from any source that was critical of Dr. Sabater's care of Bias.

The facts are essentially undisputed. Bias attempted suicide sometime during the evening of May 20 by slicing his wrist and ingesting prescription drugs he had surreptitiously saved over a period of almost a month. The district court did not find that Sabater had any responsibility for Bias's possession or ingestion of those drugs. Nor was Sabater on duty or present at the prison on May 20 when the suicide attempt occurred. Other medical personnel attended Bias after his attempt to take his own life, and when asked if he had taken any medication, he repeatedly replied that he had only taken what Sabater had prescribed and in the amounts prescribed. Bias's drug ingestion was not known to any prison official or attendee, including Dr. Sabater, until long after Bias had left the Allred facility.

Sabater saw Bias at approximately noon on the day after his suicide attempt. She examined him, concluded that he remained clinically depressed, and requested TDCJ to transfer Bias by its next available transport to the Montford Unit, where TDCJ's psychiatric unit was located.

The TDCJ van did not arrive until about 7:30 the next morning, May 22. Prison officials ordered Bias from his cell, but he did not respond. A use-of-force team was called to remove Bias from his cell, and the team recorded the events on videotape. The video shows Bias lying on his back, without clothing, on a "suicide blanket." The guards on the team ordered Bias to "wake up" and "open [his] eyes." Bias responded by raising his head and tilting it slightly. The guards used an ammonia inhalant, to which Bias responded with a groan and slight movement. The remainder of the video reflects that Bias appeared motionless and limp as the guards dressed him, handcuffed him, and laid him on a gurney. At least twice during the video, Dr. Sabater and a nurse appeared and took Bias's vital signs, which were normal. Dr. Sabater flashed a light in Bias's eyes and reported normal reactivity. Dr. Sabater testified at trial that based on those diagnostics and observations she concluded her original diagnosis of clinical depression explained Bias's physical condition. The videotape concludes with guards placing Bias in the TDCJ van on his back in a confined space.

Josie Grubbs, a nurse present during the transfer, told Allred investigators that "in hindsight a drug screen may have been [of] some assistance in determining Offender Bias's condition," but that she had no reason to believe that an overdose caused his condition. Curtis Cooper, an associate clinical psychologist also present, told the investigators that Bias was unresponsive to the ammonia inhalant and speculated his condition was due to "waxy flexibility," which he described as the brain and body working asynchronously. Cooper further stated that "although Dr. Sabater could have requested an opinion of another physician," that was not in her nature. Nonetheless, Cooper stated "Offender Bias's vital signs were within acceptable range and there was no other indicator present" to suggest an overdose.

This uncontradicted evidence does not support a finding of deliberate indifference. Bias's complaint at trial that Sabater should have done more does not raise a fact question, and the Supreme Court has held that such a complaint fails to demonstrate deliberate indifference.[2]

The district court seems to have based its finding of deliberate indifference largely, if not entirely, on the videotape. The second conclusion in the district court's opinion is that "the Court finds that plaintiff's condition on May 22, 1997 was an exceptional circumstance obviously requiring immediate medical attention. A review of the videotape along with the testimony presented at trial confirms this finding." However, the three health-care professionals who attended Bias while he was being prepared to be taken to the Montford Unit actually examined Bias. His eyes and pupils were examined. His vital signs were checked, more than once, and they were normal. None of the three attending professionals thought at the time that transporting Bias to the Montford Unit would place him at risk. All of this is undisputed. A layperson cannot independently draw the conclusion that Bias was at risk just because, in hindsight, it is now known that Bias was injured during the transportation.

The trip to the Robinson Unit lasted approximately three hours. Apparently, had the transport van gone directly to the Montford Unit, the travel time would have been about forty-five minutes longer. The district court deduced that Bias's limp condition when he was placed in the van made a substantial risk of serious harm obvious. But how does a limp condition allow a layman to conclude that travel in the back of a van for three hours creates such a risk? It is not intuitively or otherwise obvious that lying in a prone, immobile position for three hours presents a risk. Common experience suggests otherwise.

---

[2] Estelle v. Gamble, 429 U.S. 97, 107 (1976).

There is simply nothing in the record that permits the inferences the district court drew.

The third conclusion in the district court's opinion is similar to the others: "The Court finds that the plaintiff's condition on May 22, 1997, immediately prior to his transport out of the Allred Unit, was open and obvious, that Dr. Sabater was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, that she actually drew that inference and that her intentional failure to act caused a prolonged delay in medical care and resulted in substantial injury to Michael Bias." Here again, the nature of Bias's condition and the risks that transporting him posed were not matters about which a layperson has knowledge. If Dr. Sabater had entirely turned her back on Bias and refused to undertake any examination or treatment, this might well be a different case. But she did not. She ordered that he be sent to another facility for care, she continued to examine him, she monitored him, and other health care professionals assisted her. Her professional judgment may have been faulty, but there is no basis for concluding she was deliberately indifferent.

The term "deliberate indifference" is not self-defining,[3] but the Supreme Court frequently defines it in relation to negligence and, in cases such as this, medical malpractice.[4] The Court notes deliberate indifference "describes a state of mind more blameworthy than negligence."[5] Eighth Amendment liability for deliberate indifference requires "'more than ordinary lack of due care for the prisoner's interests or safety'"—i.e., more than medical malpractice.[6] In cases involving medical treatment, a prisoner's complaint that a physician was merely

_____

[3] Farmer, 511 U.S. at 836.

[4] See, e.g., Estelle, 429 U.S. at 107 (1976).

[5] Farmer, 511 U.S. at 835 (emphasis added).

[6] Id. (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).

negligent in diagnosing or treating the prisoner fails to state a claim under the Eighth Amendment.[7] "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."[8] The facts in this case present "a classic example of a matter for medical judgment."[9] "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice."[10] Sabater made the medical decision to transfer Bias to the psychiatric unit at another prison. Without evidence of the standard of care that obtained, a court cannot determine that Sabater deviated from that standard, much less that she acted with deliberate indifference in treating and evaluating Bias. Establishing the standard of care requires specialized knowledge and training. Lay fact-finders cannot determine from their own observations whether a physician's course of conduct was proper.

The concurring opinion concludes that Bias's "obvious and emergent condition" distinguishes this case from Estelle. What may be "obvious and emergent" to a layman is a different question from what is obvious and emergent to a physician. Medical personnel routinely encounter patients whose prognosis looks extremely grave to the lay observer, but physicians using medical diagnostics would draw a very different conclusion. Laymen cannot judge whether transportation of a patient in Bias's condition posed a substantial risk of serious harm.

The concurring opinion cites this court's decision in Gobert v. Caldwell[11] for the proposition that "expert testimony cannot create a question of fact as to

---

[7] Estelle, 429 U.S. at 106.

[8] Id.

[9] Id. at 107.

[10] Id.

[11] 463 F.3d 339, 348 n.29 (5th Cir. 2006).

18

what [the doctor] knew," then reasons that Bias established the subjective knowledge prong of deliberate indifference because the factfinder could "infer . . . subjective knowledge" from "the obviousness of [Bias's] condition and its risks."[12] Our decision in Gobert not only fails to support this conclusion, Gobert requires that we reverse and render judgment for Sabater in this case.

We correctly recognized in Gobert that an inmate "must first prove objective exposure to a substantial risk of serious harm"[13] and that "the decision whether to provide additional treatment is a classic example of a matter for medical judgment."[14] We do not reach the subjective knowledge element unless and until there is evidence of exposure to a substantial risk of serious harm. There is no such evidence in this case. It cannot be "inferred" by laymen. The footnote in Gobert on which the concurring opinion relies recognizes this.[15] However, the presence of a substantial health risk was not at issue in that case because the defendant physician acknowledged that he knew that developing a serious infection in the inmate's leg was a "concern."[16] Gobert's leg had been crushed below the knee when the garbage truck on which he was riding as a "'hopper'" collided with another vehicle, and he had surgery that included the

---

[12] Ante, p. __.

[13] 463 F.3d at 345.

[14] Id. at 346 (internal quotation marks omitted).

[15] Id. at 348 n.29 ("As we must focus on Caldwell's [a physician's] subjective knowledge, expert testimony cannot create a question of fact as to what Caldwell actually knew. Campbell v. Sikes, 169 F.3d 1353, 1368 (11th Cir. 1999) ('[S]ince the facts and circumstances of this case do not allow an inference that Sikes not only should have perceived the risk but also actually did perceive it, does the opinion testimony by Plaintiff's medical experts based on those same facts and circumstances provide the missing Farmer link? The answer is no.'). We caution that the expert testimony is only probative of what inferences Caldwell, himself, could have made; whether he should have made the connection is irrelevant to this analysis.").

[16] Id. at 349.

placement of pins in his leg.[17] Gobert was continuously on antibiotics for more than two months, except for seven days at issue in the case, his wound frequently exuded puss and blood, including areas around the pins, and there was swelling and redness on occasion. The court therefore concluded in Gobert that the nature of the inmate's "wound itself posed a substantial health risk."[18] Within days of his release from prison, Gobert was diagnosed with a very serious infection of the bone in his injured leg.[19] The court nevertheless held, as a matter of law on summary judgment, that the "extremely high standard"[20] of deliberate indifference had not been met[21] in spite of the district court's conclusion that numerous fact issues existed regarding deliberate indifference, including "whether [the physician] looked at the medical records" and "whether or not other actions should have been taken."[22]

---

[17] Id. at 343-44.

[18] Id. at 349.

[19] Id. at 344.

[20] Id. at 346.

[21] Id. at 352.

[22] Id. at 347. The district court had ruled:

I . . . think there are just too many issues of fact . . . [concerning] whether he looked at the medical records; whether he should have seen [Gobert] the amount of times he saw him; whether he was prescribing or not prescribing. . . . I just see too many material issues of fact dealing with what Dr. Caldwell did or didn't do at appropriate times; whether he reviewed or didn't review the medical records; whether or not other actions should have been taken; whether or not the records that were developed at the Earl K. Long Hospital were appropriately sent and filed in his record; whether he even should have taken efforts to look at those records; whether x-rays should have been done earlier and reviewed earlier . . . whether there was probative evidence that Dr. Caldwell did perceive the plaintiff had an infection prior to August 7, whether or not he appropriately relied on what the medical records were . . . .

20

The Eleventh Circuit's decision in Campbell v. Sikes,[23] cited in Gobert, noted that "[p]roof that the defendant should have perceived the risk, but did not, is insufficient" to prove deliberate indifference.[24]  In this case, we have no reliable evidence that there was a substantial risk, much less that Sabater should have  perceived or actually recognized a substantial risk to Bias such as necrosis from being transported in a van.

The concurring opinion concludes that "the fact that when Bias finally arrived at the Hendricks Medical Center and received proper treatment, he was immediately diagnosed as suffering from a drug overdose, as well as necrosis and other physical injuries he did not have when Dr. Sabater had him crammed into the van" establishes "disregard for the substantial risks to Bias's health."[25] None of the physicians or other health care providers who eventually diagnosed Bias were critical of the care that Sabater provided.  They did not offer the objective evidence necessary to establish that at the time Sabater and the other health care professionals at the prison administered medical care, a substantial risk of serious harm to Bias existed.  Bias did not have necrosis at that time.  That condition undisputedly developed while he was in the van.  Undoubtedly, Sabater and others failed to diagnose his drug overdose.  But there is no evidence that the misdiagnosis even amounted to negligence.  Nor is there evidence that placing Bias in a van, rather than an ambulance, posed a substantial risk of serious injury.  A layman cannot make a determination that such a risk existed without the aid of expert testimony.

This is not a close case, and I must say that I am mystified by the reaction the videotape in this case has engendered.  Respectfully, I must dissent.

---

[23] 169 F.3d 1353 (11th Cir. 1999).

[24] Id. at 1364.

[25] Ante, p. __.