# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50981

United States Court of Appeals
Fifth Circuit

**FILED**

August 17, 2017

Lyle W. Cayce
Clerk

GEORGE TRAMMELL,

      Plaintiff–Appellant,

v.

KEVIN FRUGE, in his individual and official capacity; MIKE KROGMANN, in his individual and official capacity; BRIAN NEVEU, in his individual and official capacity; E. F. DELAROSA, in his/her individual and official capacity; HUNTER WEBB, in his individual and official capacity; M. GARZA, in his/her individual and official capacity; SHELBY INGLES, in her individual and official capacity; CITY OF ROUND ROCK, TEXAS; JOHN DOES 1-5,

      Defendants–Appellees.

---

Appeal from the United States District Court
for the Western District of Texas

---

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant George Trammel sued Defendants–Appellees Kevin Fruge, Mike Krogmann, Brian Neveu, E.F. Delarosa, Hunter Webb, Marciano Garza, Shelby Ingles, and the City of Round Rock, Texas ("Round Rock") under 42 U.S.C. §§ 1983 and 1988 alleging that the Defendants violated his Fourth and Fourteenth Amendment rights during his arrest on January 21, 2013. The district court granted summary judgment in favor of the Defendants. We AFFIRM in part and REVERSE and REMAND in part.

No. 16-50981

## I. BACKGROUND

### A.    Facts

At approximately 12:00 a.m. on January 21, 2013, the Round Rock Police Department received a 911 call about an individual who had crashed his motorcycle after leaving the El New Goal Post Club ("the Goal Post") and was believed to be intoxicated. Police officers were dispatched to the scene.

Officer Kevin Fruge was the first to arrive and was directed to a parking lot across the street from the Goal Post where the suspect, George Trammel, was located. Fruge testified that when he pulled into the parking lot he observed a man in a dark jacket standing near a parked motorcycle.[1] Officer Fruge contends that on arrival he "immediately detected a strong odor of an alcoholic beverage emitting from [Trammel's] breath."[2]

On exiting his vehicle, Officer Fruge instructed Trammel to "step away from the motorcycle." Because he was on the phone and is hearing impaired, Trammel did not respond to Officer Fruge's first command. Then Officer Fruge again requested that Trammel step away from the motorcycle. This time Trammel responded, "What?" Officer Fruge then raised his voice and commanded that Trammel "step away from the motorcycle" a third time. Trammel replied "okay" and complied with Officer Fruge's request.

---

[1] Officer Fruge stated the motorcycle appeared to be parked "on its kickstand." Trammel, however, claims the motorcycle "was parked on a center stand for long-term parking, not a kickstand." Trammel claims that, as a result, he would have been "unable to do an easy 'take off.'"

[2] In the incident report, Officer Fruge also stated that he noticed Trammel's "eyes were watery and bloodshot and he slurred when he spoke," that Trammel "had a large wet area in the crotch of his pants," and that he "had a difficult time standing up and would sway back and forth." While Trammel does not dispute that he was slurring, he questions whether Officer Fruge could have seen his eyes in the dark and claims that he only had a wet spot on his pants after his arrest due "to a compression of his bladder by the Officers during the assault." Trammel also claims he was not swaying, but this assertion is belied by the dash cam footage, which clearly shows that Trammel is unsteady on his feet, Even viewing these facts in the light most favorable to Trammel, a reasonable officer would suspect based on the smell of alcohol, slurred speech, and swaying that Trammel was intoxicated.

No. 16-50981

Officer Fruge and Trammel then had the following exchange:

OFFICER FRUGE: "What's goin' on? What's goin' on?"

TRAMMEL: "Nothing. I parked my bike."

OFFICER FRUGE: "You parked it?"

TRAMMEL: "Yeah."

OFFICER FRUGE: "Did you wreck it?"

TRAMMEL: "No. I didn't wreck my bike."

OFFICER FRUGE: "Let me ask you a question, sir. How much have you had to drink tonight?"

TRAMMEL: "A whole lot of nothin'."

OFFICER FRUGE: "A whole lot of nothing? How much is that?"

TRAMMEL: "A whole lot of nothin'."

OFFICER FRUGE: "How much is that, sir?"

TRAMMEL: "I'm not going to answer."

OFFICER FRUGE: "Huh?"

TRAMMEL: "I'm not going to answer."

As the dash cam video confirms, Trammel remained calm throughout this interaction.

Officer Fruge then asked Trammel, "Well, can you walk towards me?" Trammel declined and said, "No." Officer Fruge then commanded Trammel to place his hands behind his back. Trammel again told Officer Fruge, "I'm not answering your questions," and did not comply with Officer Fruge's request. At this point, Trammel took off the jacket he was wearing because he felt hot and said, "I'm not going to jail."

At this point, Officer Fruge believed he had probable cause to arrest Trammel for public intoxication, and he grabbed Trammel's right arm as he told him to put his hands behind his back. Trammel immediately pulled back

3

No. 16-50981

and told Officer Fruge that it hurt and not to grab him there.[3] Officer Ingles then grabbed Trammel's left arm, but Trammel again pulled away.[4] Officer Fruge executed a knee strike on Trammel's right thigh, and Trammel lost his balance. Officer Garza put Trammel in a headlock as he, Officer Neveu, and Officer Fruge pulled Trammel to the ground.[5] Trammel states that he initially had his "arms in front of [his] body . . . [because he] was trying to prevent [his] fall," but that the officers were grabbing at his arms and landed on top of his body so that he landed face first on the pavement. Trammel claims that at some point when he was on the ground he "lost memory," but prior to this, he recalled a brief period of time where he could not breathe.

While on the ground, the officers tried to grab hold of Trammel's arms, which were underneath him. The officers repeatedly asked Trammel to put his hands behind his back, and he apparently refused to comply.[6] After the officers tackled Trammel, he can first be heard yelling that he is a cop, and later, as the officers command him to "stop resisting," Trammel can be repeatedly heard yelling that his arm is fused. During this time, the officers administered knee

---

[3] Trammel states in his declaration that his right arm "has a surgical fusion, which means there is a rod extending from the end of [his] middle finger to the upper part of [his] forearm," and that it hurt when Officer Fruge grabbed it because he had the fusion "surgery in July and was still recovering." He also claims that the surgery inhibits his "ability to move [his] arms behind [his] body and . . . [his] overhead mobility."

[4] The dash cam footage reveals that this exchange—from the first moment Officer Fruge requested that Trammel place his hands behind his back until the officers tackled Trammel—lasted approximately three seconds.

[5] Officers Garza, Neveu, and Ingles arrived at the scene shortly after Officer Fruge and claim to have witnessed a majority of the interaction between Officer Fruge and Trammel—beginning with Trammel's refusal to put his arms behind his back.

[6] One of the officers at the scene told Trammel to put his hands behind his back as the group tackled him, and the officers can be heard repeatedly making this request on the dash cam footage while Trammel and the three officers were on the ground.

strikes to Trammel's arms, thighs, and ribs so that they could subdue and handcuff him.[7]

Six days after the arrest, Trammel received a medical exam and was diagnosed with "mildly displaced right L1, L2, and L3 transverse process fractures." Since the incident, Trammel has stopped riding his motorcycle, hunting, sailing, fishing, playing with his grandchildren the way he used to, and has "very limited mobility." Trammel has also had to get a "new vehicle with a scooter" and uses a wheelchair while at home.

## B.    Procedural History

On January 21, 2015, Trammel filed suit against the City of Round Rock and the above-named police officers pursuant to 42 U.S.C. §§ 1983 and 1988 alleging violations of his Fourth and Fourteenth Amendment rights. Trammel specifically claimed that the officers violated his constitutional right to be free from unlawful restraint and excessive force and that Round Rock is liable for its failure to supervise and adequately train its officers. On June 29, 2016, the district court granted summary judgment in favor of Round Rock and Officers Fruge, Neveu, Delarosa, Webb, and Garza. On July 12, 2016, the court also granted summary judgment in favor of Sergeant Krogmann and Officer Ingles after giving Trammel an opportunity to offer evidence in support of his claims against those parties. This appeal followed.

---

[7] There is some disagreement about the number and location of the knee strikes. While Officer Neveu claimed he struck Trammel only two or three times and only made contact with his thigh, Officer Fruge claimed to have observed Officer Neveu administer knee strikes to the "upper arm, body area," and Trammel claims that multiple officers were striking him in the ribs and lower back with their fists and knees. Trammel's medical records following the altercation support his version of events given that he reported to medical professionals that he was experiencing right-sided abdominal pain. Because we resolve fact disputes in favor of the nonmoving party, we resolve this discrepancy in favor of Trammel.

No. 16-50981

## II. DISCUSSION

### A.     Standard of Review

"This court reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016)). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[W]e view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Hanks*, 853 F.3d at 743 (internal quotation marks omitted) (quoting *Griggs*, 841 F.3d at 312). But "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Id.* at 744 (quoting *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015)). "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* (citation and internal quotation marks omitted) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

### B.     Analysis

On appeal, Trammel argues that the district court erred in granting summary judgment: (1) in favor of Officers Fruge, Garza, Neveu, and Ingles on the basis of qualified immunity with respect to his excessive force and failure-

to-intervene claims; and (2) in favor of Round Rock on his municipal liability claims.[8] We address each argument in turn.

### 1. Officers Fruge, Garza, Ingles, and Neveu

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, a court engages in a two-part inquiry asking: first, whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right"; and second, "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although the Supreme Court has recognized considering these two questions in order "should not be regarded as mandatory in all cases . . . it is often beneficial." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning

---

[8] The district court also granted summary judgment in favor of Officers Fruge, Garza, Neveu, and Ingles on Trammel's unlawful arrest claim, in favor of Sergeant Krogmann on Trammel's failure-to-intervene and failure-to-supervise claims, and with respect to Trammel's claims against Officers Delarosa and Webb. Because Trammel does not address these claims on appeal, we find them waived. *See United States v. Griffith*, 522 F.3d 607, 610 (5th Cir. 2008).

that the conduct then at issue violated constitutional rights.'" *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

Here, Trammel contends that the force used by Officers Fruge, Garza, Neveu, and Ingles was excessive to the need and that his right to be free from such force was clearly established. In addition, Trammel claims that the conduct of the officers during the arrest was so egregious they should each be "liable for failing to intervene to protect Trammell from the other Officers' use of excessive force." Accordingly, he argues that the officers are not entitled to qualified immunity.

### a. Constitutional violation

Starting with the first prong of the qualified immunity analysis, we consider, viewing the facts in the light most favorable to Trammel, whether the officers' actions during Trammel's arrest violated his Fourth Amendment rights. The Fourth Amendment creates a "right to be free from excessive force during a seizure." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *accord* U.S. Const. amend. IV. "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

The test used to determine whether a use of force was reasonable under the Fourth Amendment "is not capable of precise definition or mechanical application." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Rather, "its proper application requires careful attention to the facts and circumstances of each particular case, including" (1) "the severity of the crime at issue," (2) "whether the suspect

poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Thus, the overarching question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

Here, the parties only dispute whether the force used during Trammel's arrest was excessive. As an initial matter, public intoxication is a Class C misdemeanor, *see* Tex. Penal Code § 49.02(c), and thus is a minor offense militating against the use of force, *see Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding the "severity" factor from *Graham* militated against a use of force where the alleged crime was a misdemeanor).

Moreover, a fact question exists as to whether Trammel posed a danger to himself or others. Officer Fruge testified that Trammel was swaying and that he believed that Trammel could endanger himself by "stumbl[ing] out into the roadway" or endanger others by "get[ting] on the motorcycle, and driv[ing] away." But viewing the facts in the light most favorable to Trammel, it is not clear that a reasonable officer would have perceived such a danger. First, Officer Fruge admitted, and the dash cam footage confirms, that even though Trammel was swaying, it did not appear that he was going to fall over. Thus, there is a question of fact as to whether Trammel posed any danger to himself. Second, Trammel claims that his motorcycle was parked on a "center stand," which is intended for long-term parking and would have prevented him from quickly taking off. Although Officer Fruge testified that it "looked like [the motorcycle] was on its kickstand," we view the facts in the light most favorable to Trammel. Given the circumstances as presented by Trammel, we conclude that, at minimum, a fact issue exists as to whether a reasonable officer would

have perceived Trammel as being a danger to others, considering that Trammel had stepped away from the motorcycle and showed no intention of mounting and riding away on it, and considering that the motorcycle that was turned off and parked on a center stand. Accordingly, we find that there is a fact issue as to whether the dangerousness factor bears in favor of using force to subdue Trammel.

Finally, it appears that Trammel was not attempting to flee, and it remains unclear whether he was actively resisting arrest. The only indication that Trammel may have intended to flee was his statement that he was "not going to jail." But none of Trammel's other conduct indicated that he was going to run away from the officers—Trammel did not make any motions indicating an attempt to escape and his motorcycle was not running. S*ee Deville*, 567 F.3d at 167 (finding that "while [the plaintiff] was in control of the vehicle and its motor was running and its gear in park," according to her version of events, "there was no evidence or other indication that she would flee or use the vehicle as a weapon"). On such facts, we cannot find that a reasonable officer would have believed that Trammel was attempting, or intended, to flee the scene.

We also find that there is a factual dispute as to whether Trammel was actively resisting arrest throughout his encounter with the police officers. "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (citations omitted) (quoting *Gomez v. Chandler,* 163 F.3d 921, 923 (5th Cir. 1999)). For instance, where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *See Hanks*, 853 F.3d at 746 (determining the plaintiff's initial refusals to follow a police officer's instructions amounted to, "at most, passive resistance" and did not justify the officers use of a "'half spear'

takedown" against the plaintiff); *Deville*, 567 F.3d at 168 (the plaintiff's refusal to get out of her car before her husband arrived on the scene constituted passive resistance).

It is unclear at what point passive resistance becomes the sort of active resistance which justifies force. *See Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000). For example, in *Goodson*, two police officers stopped the plaintiff, believing that he matched the description of an individual suspected of assault. *Id.* at 733. One of the police officers instructed the plaintiff to "put his hands on the [police] car." *Id.* at 734. The plaintiff claimed that before he could comply the officer grabbed his arm. *Id.* The plaintiff "stated that he pulled his arm away from [the officer] in surprise and stumbled back in an attempt to regain his balance and maintain a little distance from the police officers." *Id.* Thereafter, the plaintiff claimed the two officers together tackled him to the ground. *Id.* In reversing the district court's summary judgment based on qualified immunity, this Court held that a fact question "exist[ed] as to the objective reasonableness of the force used" under the circumstances. *Id.* at 740. The Court did not describe the plaintiff's decision to pull his arm away from the officer as resistance. *Id.* And given that the officers lacked reasonable suspicion to detain or frisk the plaintiff and that the plaintiff was not fleeing, the Court declined to conclude that the plaintiff's decision to pull away from the officers justified the amount of force used. *Id.*

Just as in *Goodson*, it appears that Trammel's only physical resistance prior to being tackled was his attempt to pull his arm away. In fact, the dash cam footage reveals that Trammel did not even use much force in pulling away from the officers; although Trammel can clearly be seen moving his arm in the opposite direction from Officer Fruge, he is only able to move it away by a few inches such that the officer's hand never lost contact with Trammel's arm. It also appears that Officer Fruge himself was not pulled forward. Trammel was

neither aggressive nor violent toward the officers prior to being tackled. As discussed above, Trammel was suspected of only a minor offense, and there was little indication he would flee. It is also unclear whether a reasonable officer would have thought that Trammel posed a danger to himself and others. Thus, as in *Goodson*, we conclude that a reasonable jury could conclude that the officers' use of force was clearly excessive to the circumstances.

Moreover, even if Trammel's decision to pull his arm away from the officers can be characterized as some degree of resistance that would justify an officer's use of force, the quickness with which the officers resorted to tackling Trammel to the ground militates against a finding of reasonableness. This Court has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need. *See Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to'" force); *Deville*, 567 F.3d at 168 (determining that "[a] reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant officer] engaged in very little, if any, negotiation with [the plaintiff]—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle").

Given that only three seconds elapsed between Officer Fruge's initial request that Trammel place his hands behind his back and when Officers Fruge, Garza, and Neveu tackled Trammel, we find that a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to physical violence, and that the officers' conduct did not constitute the required "measured and ascending" actions calibrated to Trammel's conduct. *Poole*, 691 F.3d at 629 (quoting *Galvan v. City of San Antonio*, 435 F. App'x

No. 16-50981

309, 311 (5th Cir. 2010)). Accordingly, we hold that a reasonable jury could find that Trammel's pulling his arms away from the officers, along with the other circumstances of Trammel's arrest, did not justify the officers' decision to tackle Trammel to the ground. Thus, there is a genuine dispute of material fact as to whether the officers' use of force was objectively unreasonable.

Similarly, we find that Trammel has independently presented a question of material fact as to whether the force used to gain control of his arms was excessive to the need. Viewing the facts in the light most favorable to Trammel, after the officers tackled him, they pummeled Trammel with their knees and fists in an attempt to get him to put his arms behind his back. Trammel contends the officers continued to do so even after he shouted that his arm was fused. Because Trammel's yelling about his arm can clearly be made out from the dash cam footage, a jury could reasonably infer that the officers heard Trammel's plea but nevertheless continued to beat him without consideration for his limited mobility and strength. Since Officer Fruge testified that Trammel never exhibited a desire to harm any of the officers, a reasonable jury could determine that, under the circumstances, the officers' decision to continue using force was objectively unreasonable.

Thus, we hold that Trammel has presented sufficient facts to allege a violation of his constitutional right to be free from excessive force against Officers Fruge, Garza, and Nevue.[9]

---

[9] However, we hold that Trammel has not raised sufficient facts to allege an excessive force claim against Officer Ingles. Officer Ingles's only involvement in the altercation was apparently an attempt to grab Trammel's left arm. Because Trammel has not alleged any injury stemming from Officer Ingles's conduct, and given that it is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect, we find that Trammel has not raised sufficient facts to allege an independent excessive force violation against Officer Ingles. Qualified immunity as to this claim is thus appropriate.

### *b.  Clearly established law*

We next turn to whether the law at the time of Trammel's arrest was clearly established. We conclude that it was. As discussed above, this Court's opinion in *Goodson* outlines a scenario very similar to this case. Both *Goodson* and this case involve a plaintiff who was tackled by officers after very minimal physical resistance—pulling away from an officer after the officer grabbed the plaintiff's arm. The primary distinction between *Goodson* and this case appears to be the fact that in *Goodson*, the defendant officers lacked any reasonable suspicion to detain or frisk the plaintiff in the first place. *Goodson*, 202 F.3d at 740. Here, on the other hand, it is virtually undisputed that the officers had probable cause to arrest Trammel for public intoxication. But we find this distinction is merely a matter of degree.

In *Graham*, the Supreme Court directed lower courts to consider "the severity of the crime at issue" in determining whether police officers used excessive force. *Graham*, 490 U.S. at 1872. We interpret *Goodson*'s focus on reasonable suspicion as a consideration of this factor. So, while in *Goodson*, the officers lacked reasonable suspicion that the plaintiff had committed any crime, here the officers believed the plaintiff was guilty of the minor offense of public intoxication. Although the severity factor may have weighed slightly more in favor of finding a use of force reasonable in this case than it did in *Goodson*, we nevertheless conclude that *Goodson* gave officers "fair warning" that their conduct was unconstitutional. *See Ramirez*, 716 F.3d at 379. Accordingly, the law at the time of Trammel's arrest clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp.

### c. Failure to intervene

Trammel also argues that each of the involved officers should be liable for failing to intervene to prevent the alleged excessive force used by their fellow officers. Below, Trammel argued only that those officers *not directly involved* in the alleged use of excessive force should be liable for failing to intervene. Because Trammel raises this argument as to Officers Fruge, Garza, Neveu, and Ingles only on appeal—and because he alleges that all four of these officers were directly involved in the use of force—we find the failure-to-intervene claim waived.[10] *See Pluet v. Frasier*, 355 F.3d 381, 385 (5th Cir. 2004).

### 2. Round Rock

Finally, Trammel argues that the district court erred in granting summary judgment in favor of Round Rock. First, Trammel contends that the conflicting statements of Officers Webb and Fruge regarding the Round Rock Police Department's policy on the use of knee and fist strikes creates a material question of fact as to the content of the department's official policy and as to whether Round Rock's training procedures were inadequate. Second, Trammel seems to contend that Officer Ingles's failure to prevent Officer Garza from putting Trammel in a headlock amounts to deliberate indifference which should be imputed to Round Rock. And third, Trammel claims that Round Rock's "Response to Resistance or Aggression Policy, which touts 'reasonable' as its standard, does not give a realistic safeguard against" the use of excessive force.

---

[10] As previously noted, we find Trammel's failure to intervene claim as to the other defendants—Sergeant Krogmann and Officers Webb and Delarosa—waived because it is not briefed on appeal.

15

No. 16-50981

### a. Unconstitutional policy or practice

To the extent that Trammel alleges that Round Rock maintained an unconstitutional policy or practice, we conclude that summary judgment was appropriate. In general, a municipality cannot be held liable for constitutional violations committed by its employees or agents on a theory of vicarious liability. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691–92 (1978). "To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

As an initial matter, Trammel has not presented any evidence of the sort of "persistent, often repeated, constant violations that constitute custom and policy," and which could be attributed to Round Rock. *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984) (en banc)). Rather, the evidence to which Trammel points amounts to no more than the kind of "isolated instance[]" of conduct for which a "municipality is almost never liable." *Peterson* 588 F.3d at 847, 851. And even if we accepted Trammel's contention that a pattern of unconstitutional conduct exists, he has presented no evidence that this "policy" was promulgated by a municipal policymaker—let alone identified who that policymaker is—or that such a policy was the moving force behind the alleged constitutional violation in this case. Finally, Trammel's argument about imputing Officer Ingles's conduct to Round Rock fails. Even if we agreed that Officer Ingles should have intervened during the arrest,

16

No. 16-50981

without more, her actions cannot be attributed to Round Rock. *See Monell*, 436 U.S. at 691–92; *Mason*, 806 F.3d at 280. Summary judgment was appropriate as to Trammel's municipal liability claim against Round Rock.

### b. Failure to train or supervise[11]

To the extent that Trammel alleges a failure to train claim, we also find summary judgment was appropriate. "To prevail on a 'failure to train theory' a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010). "In order for liability to attach based on an inadequate training claim, a plaintiff must allege with specificity how a particular training program is defective." *Id.* (internal quotation marks omitted) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

First, Trammel fails to identify any specific inadequacies in Round Rock's training materials or procedures which give rise to his claim. He offers only the conflicting testimony of Officers Webb and Fruge regarding their training as to knee and fist strikes. *See id.* ("[T]his Court has previously rejected attempts by plaintiffs to present evidence of isolated violations and ascribe those violations to a failure to train."); *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) ("To satisfy the

---

[11] Because a failure-to-supervise claim is evaluated in the same way as a failure-to-train claim, *see Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003), we do not address Trammel's claims as to supervision and training separately. Moreover, Trammel's only independent argument regarding his supervision claim stems from Officer Ingles's conduct. Since municipal liability cannot be imputed based on a respondeat superior theory, *Monell*, 436 U.S. at 691–92, we reject this argument as a ground for reversing summary judgment on the municipal liability claim. Given that Trammel does not raise this argument on appeal against Officer Ingles in her individual capacity, we find any such argument waived. *See Griffith*, 522 F.3d at 610.

17

deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." (internal quotation marks omitted) (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)). But even if we accepted this testimony as adequate proof of the first element of Trammel's failure to train claim, he makes no showing of deliberate indifference or causation. Summary judgment was thus appropriate.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgment as to Trammel's claims against Round Rock and Officer Ingles. We REVERSE the district court's summary judgment as to Trammel's excessive force claims against Officers Fruge, Garza, and Neveu and REMAND for further proceedings consistent with this opinion.

No. 16-50981

LESLIE H. SOUTHWICK, Circuit Judge, dissenting in part.

I concur with the majority's decision to affirm the judgment of the district court as to Trammell's claims against the City of Round Rock and Officer Ingles. I respectfully dissent, however, from the decision to reverse summary judgment as to Trammell's excessive-force claims against Officers Fruge, Garza, and Neveu.

The district court granted a summary judgment, so we view the facts in the light most favorable to Trammell. *See Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016). Still, we must judge the reasonableness of the force used "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them," we must be mindful that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The key moment in the encounter came when Officer Fruge reached for Trammell's arm as he told Trammell to put his hands behind his back. At that point, Officer Fruge had three times asked Trammell to step away from his motorcycle before Trammell complied. He had asked Trammell to walk towards him, to which Trammell responded, "No." Trammell had already stated "I'm not going to jail" as he took his jacket off. When Officer Fruge then reached for Trammell's arm as he told him to place his hands behind his back, Trammell concedes he "instantly pulled back," saying it hurt and not to grab him there. The other officers saw Trammell pull away from Officer Fruge, and Officer Ingles reached for Trammell's other arm. Trammell continued to pull

19

away. This reaching and pulling escalated quickly — in a matter of seconds — and the officers responded by taking Trammell to the ground.

This is the sort of "tense, uncertain, and rapidly evolving" situation that police officers often face in the performance of their duties. *See Graham*, 490 U.S. at 397. The officers faced an apparently intoxicated individual, at night in a dimly lit area, who would not respond to commands. True, Trammell's alleged public-intoxication offense was a crime of minor severity, but the offense itself supports that a reasonable officer would have viewed Trammell as a danger to himself or others, as the offense requires. *See* TEX. PENAL CODE § 49.02(a). Moreover, it is clear that Trammell refused verbal commands and then physically resisted the officers' attempt to arrest him. *See Griggs*, 841 F.3d at 314. In light of the circumstances confronting the officers, the officers' decision to use this degree of force, which included a knee strike to Trammell's thigh and pulling Trammell to the ground in a headlock, was not objectively unreasonable.

The majority concludes there are several genuine factual disputes, but it does not always view the facts from the perspective of a reasonable officer on the scene. For example, it concludes there is "a question of fact as to whether Trammell posed any danger to himself," and there is "a factual dispute as to whether Trammell was actively resisting arrest . . . ." When we review a grant of summary judgment in this context, we "first constru[e] disputed historical facts in favor of the non-movant," but we "then ask how a reasonable officer would have perceived those historical facts." *Hill v. Carroll Cnty.*, 587 F.3d 230, 234 (5th Cir. 2009). So the question is not, for example, whether "a reasonable jury might find that [Trammell] was not *actually* resisting arrest," but whether the force used was reasonable "under the facts as a reasonable officer *would perceive them*[.]" *Griggs*, 841 F.3d at 313.

The majority also focuses on the "quickness with which the officers resorted to tackling Trammell to the ground" as a factor suggesting the force used was not reasonable. We have previously considered the quickness with which an officer resorts to force in assessing the reasonableness of that force. *See Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009). We have also recognized, though, that arrests are "inherently dangerous and can escalate precipitously if the arrestee is not overcome immediately." *Poole v. City of Shreveport*, 691 F.3d 624, 631 n.6 (5th Cir. 2012). Here, the disputed use of force came in response to Trammell's "instantly" pulling away from the officers as they attempted to gain control of his hands. In other words, the escalation started when Trammell physically resisted, and the officers responded in order to gain control. *See Poole*, 691 F.3d at 625–26, 629. Perhaps the officers reached a quick decision to reach for Trammell's arm to place him under arrest, but the majority agrees that "it is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect[.]" This was not a situation where mere passive resistance was quickly followed by a police officer's sudden escalation of force. *See Deville*, 567 F.3d at 167–68.

The majority says it is "unclear at what point passive resistance becomes the sort of active resistance which justifies force," suggesting that Trammell's actions were on the passive side of resistance. Our cases discussing passive resistance, however, typically involve suspects that use little if any physical resistance. *See Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017); *Deville*, 567 F.3d at 167. Here, after Trammell declined to follow Officer Fruge's commands, and after Officer Fruge asked Trammell to put his hands behind his back, Trammell actively pulled away from the arresting officers. The majority is also convinced a fact question exists about the reasonableness of the force used to gain control over Trammell once he was on the ground.

21

No. 16-50981

Regardless, though, the law was not clearly established so that "every 'reasonable official would have understood'" that the force used here was unlawful. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The majority relies heavily on one case to conclude that the law was clearly established. *See Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000). That case focused on whether the officers violated the defendant's right to be free from seizure without reasonable suspicion. *See id.* at 736–40. After reversing summary judgment on that claim, the court also held the defendant raised a fact issue regarding whether the officers, "who lacked reasonable suspicion to detain and frisk [the defendant] and from whom [the defendant] was not fleeing," used reasonable force. *Id.* at 740. *Goodson*'s import in the excessive-force context is limited because it focused on the officers' lack of reasonable suspicion. For that reason, we said in *Poole* that *Goodson* "lack[ed] analytical force in assessing the reasonableness of [the officer's] actions" regarding the amount of force used. *Poole*, 691 F.3d at 632.

*Griggs* supports that the law was not clearly established in our case. *See Griggs*, 841 F.3d at 313–14. In *Griggs*, after the officer told the defendant to stop performing a one-legged stand sobriety test and to put his hands behind his back, the defendant "lurched to one side and said 'no, no.'" *Id.* at 313. The officer "immediately placed [the defendant] in a choke hold, swept his legs out from under him, and body-slammed him onto the nearby grass." *Id.* Once on the ground, the officer punched the defendant several times with a closed fist to the back of the head as he struggled to gain control of the defendant's hands. *Id.* at 311, 315. We concluded that our precedent did not clearly establish that the officer's takedown maneuver or use of "non-deadly punches" to gain control of the defendant was constitutionally unreasonable. *Id.* at 314–15. We distinguished *Goodson* because that case "turned not on whether the force was

excessive, but on whether the force was justified *at all* because fact issues remained as to whether the officer had reasonable suspicion to initiate the stop." *Id.* at 314. Here, as in *Griggs*, our precedents do not make clear to every reasonable officer that the force used was unlawful. *See id.* at 314–15.

I would affirm the district court in all respects. Therefore, I respectfully dissent in part.